CICELY (a slave) v. THE STATE, 13 Smedes & Marshall, 202.

### HOMICIDE.

It is well settled that it is competent for the circuit judge, in criminal prosecutions, as well as in civil cases, to modify the instructions requested on either side, so as to make them conform to his own views of the law.

The legal test of the sufficiency of evidence to authorize a conviction, is its sufficiency to satisfy the understanding and conscience of the jury; and a juror ought not to convict unless the evidence excludes from his mind all reasonable doubt of the guilt of the accused.

As an abstract proposition, the force of circumstantial evidence to warrant a conviction, ought in no case to be inferior to that which is derived from the testimony of a single witness, the lowest degree of direct evidence.  And the direct testimony of a single witness ought not to authorize a conviction, unless it were in itself sufficient to exclude from the mind of the jury every reasonable doubt of the guilt of the accused.

Error to Jasper circuit court.  HARRIS, J.

In October, 1848, the grand jury indicted Cicely, a slave of Andrew McAlpin and Thompson Wells, administrators of Achilles Wells, for the murder of Anne Longon.

The prisoner was arraigned, and upon the plea of not guilty, was convicted and sentenced to be hung.  The prisoner made a motion for a new trial, which was overruled, and she sued out a writ of error and brings the case to this court.

The substance of the evidence adduced upon the trial, the instructions of the court, and all the main facts of the case, will be found in the opinion of the court.

*Heyferon, Street* and *Evans,* for plaintiff in error,

Cited 1 Starkie Ev., 510; ib., 478, 502, 515. They reviewed the facts of the case *in extenso,* insisting that they did not sustain the verdict; they were not sufficient to establish beyond a reasonable doubt.

*D. C. Glenn,* attorney general,

Insisted that the proof disclosed a case of guilt of unexampled atrocity.

On the refusal to give the instructions asked by the prisoner, he cited and commented on 2 Phill. on Ev., (Cow. & Hill's Notes), 393, n. 323, 325; 2 Wheeler's Cr. Cases, 451; 1 Wash. C. C. Rep., 372; 1 Wheeler's Cr. Cases, 131; 3 Starkie Ev., 504, 505.

SMITH, J.:

This was an indictment for murder, tried in the circuit court of Jasper, upon which the prisoner, a slave, was convicted.

The only questions which require the consideration of this court arise upon the instructions which were requested by the counsel of the prisoner, and the decision of the court below on the motion for a new trial.

1. The first instruction is as follows, to wit: "If the jury, after weighing the evidence, have a reasonable doubt that the prisoner (the negro girl Cicely) is guilty of killing Mrs. Longon, they are bound by law to find her not guilty." This instruction was given with the following explanation or modification, to wit: "To warrant the jury in finding the prisoner guilty, there should be evidence before them sufficient to satisfy their minds of her guilt beyond a reasonable doubt. That which amounts to mere possibility only, or to conjecture or supposition, is not what is meant by a reasonable doubt. The doubt, which should properly induce a jury to withhold a verdict of guilty, should be such a doubt as would reasonably arise from the evidence before them; and if such a reasonable doubt should arise from the evidence, the prisoner should have the benefit of that doubt."

The objection urged is, that the judge refused to give the instruction without the explanation, or, as it is insisted, without

the modification above quoted.    It is well settled that it is competent for the circuit judge, in criminal prosecutions, as well as in civil cases, to modify the instructions requested on either side, so as to make them conform to his views of the law.    Walker v. McDowell, 4 S. & M., 118; Boles v. The State of Mississippi, 9 ib., 284.    The object of the court was to explain and render intelligible to the jury in what, according to the law, consisted a reasonable doubt.    The explanation was correct, and did not vary the rule laid down by the instruction, as it was presented.

2. The second instruction was as follows, to wit: " That, unless the jury are as well satisfied from the evidence of the guilt of the accused, as they would be from the testimony of a single witness testifying directly to the fact, they should acquit." This instruction was refused.

The evidence adduced on the trial of this issue was entirely indirect or circumstantial; and the object of this instruction was to institute a rule for the direction of the jury more definite than the principal which requires an acquittal, in case a reasonable doubt of the guilt of the accused should arise from the evidence.

It is said, 1 Stark. Evid., 577 (7 Am. ed.) " That the legal test of the sufficiency of evidence to authorize a conviction, is its sufficiency to satisfy the understanding and conscience of the jury.    That a juror ought not to convict, unless the evidence excludes from his mind all reasonable doubt of the guilt of the accused."    This is, doubtless, the true and only practical criterion by which the force of evidence in criminal prosecutions, sufficient for conviction, is to be determined.    For, what circumstances will produce the requisite degree of certainty or conviction in the mind of the juror, can never be the subject of any general definition.    Absolute, metaphysical and demonstrative certainty in the proof is never required.    But it is undeniably true, as an abstract proposition, that the force of circumstantial evidence, to warrant a conviction, ought, in no case, to be inferior to that which is derived from the testimony of a single witness, the lowest degree of direct evidence.    It is equally true that the direct testimony of one witness ought not to authorize a conviction, unless it were, in itself, sufficient to

exclude from the mind of the juror every reasonable doubt of the guilt of the accused. To say that the jury should acquit, unless they were as well satisfied from the evidence of the guilt of the prisoner as they would be by the testimony of a single witness testifying directly to the fact, is only saying, in a different form, that they ought to acquit unless every reasonable doubt were excluded by the evidence.

This instruction was, in effect, embraced by the previous one. The objection, however, to this instruction is, that it applies a rule which is neither practical nor altogether safe. Under the operation of this rule, the juror would be compelled to act not upon the direct effect which the evidence had produced on his mind. He would be not only required to inquire into the state of his mental convictions to ascertain whether the evidence offered in support of the prosecution had excluded from his mind all reasonable doubt; he would be forced to go farther, and to institute a comparison between the degree of conviction pro duced by the evidence and that which would be the result of the testimony of one direct witness; for that would be the standard by which he would have to determine the degree of certainty in the proof, which would authorize a conviction or require an acquittal. We have daily experience that the same evidence, in judicial proceedings, does not invariably produce the same degree of conviction in different minds. Hence, we may well conclude, that the legitimate force of the direct evidence of a single witness would be differently estimated by persons whose minds were differently constituted. The practical application of the principle contained in the instruction would, in effect, be to adopt a standard for estimating the force of this species of evidence, which would differ with the varying mental organization of each juror. Its practical effect, in all probability, would be, on the one hand, to lead to convictions in cases where, by the use of the more intelligible and safe rule, acquittals would follow; and, on the other, to produce acquittals where, by the same test, the parties would merit conviction. Upon this view of the subject, although we do not deny the abstract verity of the legal proposition contained in the instruction, we think it was properly refused.

3. The propriety of the decision of the court in overruling the motion for a new trial must be determined by the sufficiency of the evidence to sustain the verdict.

The issue was one purely of fact; and from the character of the evidence, peculiarly in the province of a jury. The evidence, as above remarked, was entirely circumstantial. The numerous facts and circumstances from which the jury were to infer the guilt or innocence of the accused, were deposed to by witnesses whose integrity, whose character for veracity, accuracy of observation and general intelligence were, we may suppose, known to the jurors. Upon the oral examination before them, they were in a condition to know whether these witnesses were influenced by any bias, by any preconception of the prisoner's guilt; or whether they deposed from a distinct and lively recollection of the incidents of the transaction, or from a vague remembrance, where the party testifying is but too liable to mistake the impressions made upon his memory by the statements of others for his own preconceptions; and to confound inferences from facts with the facts themselves. Looking at the testimony through the medium of a record, we possess none of these advantages. Those tests which are used instinctively by the juror, in determining the degree of credit to be attached to the statement of any witness, cannot be applied by us. Hence, however sacred the obligation may be which rests upon the courts to protect the humblest individual from the errors or mistakes of a jury, an appellate tribunal will always with reluctance disturb a verdict involving merely a question of fact. And hence, also, the rule, that a verdict will always be permitted to stand, unless it is opposed by a decided preponderance of the evidence, or is based on no evidence whatever. Dickson v. Parker, 3 How. 219; Fisher v. Leach, 10 S. & M., 313; Leflore v. Justice, 1 ib., 381; Nye v. Grubbs, 8 ib., 643.

The counsel for the prisoner insist, that the verdict is entirely unsupported by evidence; at most, that the finding of the jury is against a decided preponderance of the evidence. A reference to the testimony will enable us to place the subject in its proper light. Mrs. Anne Longon, the victim of the alleged crime, her two infant children, and the prisoner, who was the servant of

the family, constituted the entire household of Dr. Longon. On the night of the 12th of April last, the first witness, James E. Watts, was aroused from sleep and informed that Dr. Longon and his family were murdered. The witness rose from his bed, and providing himself with a light, in company with three other persons, proceeded to the scene of the murder. Arriving at the gate, which opened into the inclosure of Dr. Longon, the witness proposed to his companions that they should examine for tracks; and on entering the gate they discovered, about midway between that point and the house, the body of Mrs. Longon, which lay dead, with her feet upon the edge of the walk leading from the gate to the house, and her body resting upon the flower-bed which bordered it. Upon entering the gate, witness and companions proceeded cautiously and examined carefully for traces which they hoped might lead to a discovery of the perpetrator of the deed. Upon this examination, they discovered "foot prints" pointing from the house to the gate. They were the tracks of a person barefoot. Near the corpse were slight signs of a scuffle, and several "barefoot prints" of the same description. One was discovered at the back of the corpse on the flower-bed. The deceased was barefoot and in her night-clothes, and her death was caused by a severe wound on the head, behind the right ear, inflicted, as witness supposed, by some heavy weapon, such as the poll of an axe. From the body to the house were seen "foot-prints," as if they were made by two persons; one set corresponding with those found between the body and the gate, and the other supposed to be those of the deceased. No other traces or tracks were observed. It was possible for a person, by using great caution, to get into the house without leaving any traces of his ingress. The doors of the house were unprovided with shutters; one was defended by a quilt, and on entering, witness discovered on the right side of the door a large broad-axe. This axe had been, a few days before, used in hewing the walls of the house. It was, when seen, bloody. The corpse of Dr. Longon was on a bed upon the floor; the head was severed from the trunk, with the exception of a small portion of skin in the rear of the head. A murdered infant lay at the foot of the

bed, its head and face crushed. Another child was lying on the right arm of the murdered man, severely wounded. At the moment of the murder, it was supposed to be sleeping in the arms of the deceased, and from the position of the father and child, it was inferred that the same blow which had inflicted the wound on the one, had deprived the other of life. The floor, particularly near the bed, was covered with blood, the walls were sprinkled with the same material, and bloody foot-tracks were left on the floor.

Witness, after making these observations, proceeded along the road in the direction of Mr. Brown's, which was distant about one mile and a half. He continued to examine with the same circumspection for any traces of the murderer, and in the road he found foot-prints which appeared to correspond with those first seen in the walk; they pointed in the direction of Brown's. From the length of the steps, and the impressions made in the sandy parts of the road, witness inferred that they were made by a person in a walk. Half way between Longon's and Brown's, witness met prisoner, who in answer to his question, said, " that five robbers, three white men and two negroes, had come to Dr. Longon's the night before (it then being daylight) to get his money, and had killed him and his family. That after they had killed him and his family, Mrs. Longon and herself ran out of the house and were pursued by the robbers, who overtook Mrs. Longon and killed her, where she lay; but that prisoner outran Mrs. Longon and escaped, and ran over to Mr. Brown's. The robbers threw a stick at her as she passed through the gate at Dr. Longon's." At this time witness had no suspicion of the guilt of the prisoner.

Witness returned to Dr. Longon's house with the prisoner, who went in. The murdered and wounded children were sent to the house of the witness. They were accompanied by the prisoner and witness, who followed in the rear; and he did not see the prisoner have either of the children in her arms. It was not until after arriving at his house, that witness began to suspect the prisoner. He then scrutinized her person and appearance. " There was blood on her left sleeve, which looked as if it had been wiped off, or rubbed off with something; and the

front part of her dress was spattered with blood, having many specks and spots on it." The attention of those present was directed to the blood on her dress; which being observed by the prisoner, she immediately commenced picking an old wound or sore on her finger, as if with the intention of making it bleed. Her purpose was prevented. Prisoner was then asked to account for the blood on her dress. She replied "that it came from the sore on her finger." Witness was confident it did not proceed from that source. Immediately afterwards she said "it came from the quilt, which Mr. Williams had sent her for in the morning."

The prisoner was then conveyed back to Dr. Longon's for the purpose of further examination, and with the view of comparing her tracks with those discovered at the place of Mrs. Longon's murder. Her tracks were found to correspond with those first discovered in the morning, and with those seen in the walk, near where the corpse of Mrs. Longon lay. She exhibited a good deal of reluctance to have her feet compared with the tracks.

We have recited at some length the testimony of this witness, who seems to have been cool and impartial, and is manifestly observant and intelligent. His testimony establishes the fact of the homicide, conveys a distinct idea of the scene of this shocking tragedy, and proves many of the facts and circumstances from which our conclusion of the guilt or innocence of the accused is to be deduced. Several other witnesses were examined, three of whom coincide precisely, in substance, with this witness. They detail many other facts, which form important links in the chain of evidence on the part of the prosecution, and facts and circumstances relied upon by counsel, as conducive to establish the innocence of the accused. We will only extract such parts of their testimony as may have an important bearing on the issue, or refer to them in the course of our observations.

James Watts, the second witness, states, that after the prisoner had been taken into the house at Dr. Longon's, he discovered something concealed in her dress above the waist. Upon being asked what it was, she replied that it was her money, and refused to give it up upon the demand of the witness. It was

taken from her, and proved to be a purse containing between seven and eight dollars. Prisoner said the money was her own; that Dr. Longon had given her two dollars of the money and the purse, two days previously, for a purpose which the witness declined to state, and that the remainder of the money was acquired in a similar way from other persons. Upon being asked how much money the purse contained, she answered eleven dollars. Prisoner said, during this conversation, that there were three negroes and two white men who entered Dr. Longon's house; that when they came she was awake, and saw them enter. At another time she said she was asleep, and did not see them enter; that the robbers kindled a light on the hearth, and informed Longon that they wanted his money. Longon got up and said he had no money. The robbers replied that he had, and must give it to them. They bid him then to lie down, or made him lie down, and killed him. After having been taken into custody, she said that when the robbers were about to kill Dr. Longon, the night before that, he gave her some money and inform her that he owed some debts about Gordonsville, and requested her to pay them.

James E. Newsom testified that he examined the bloody footprints in the house, and believed they were made by a person barefoot, and while the blood was yet warm and uncongealed; that some of these bloody tracks corresponded in size and shape, with those of the prisoner. "The toes not making any impression, because they extended beyond where the blood was." The pantaloons of Dr. Longon were found near the head of his bed, and " one of the pockets was stained with blood, as if done by a bloody hand thrust into it;" that blood in spots appeared high up on the wall; that everything in the house was bloody, and that a person might approach the house in any direction, save that of the gate, without leaving traces of his ingress.

James Williams testified that he remained in the house, washing the children and dressing them; that whilst so engaged, prisoner came in from Brown's, who was then directed by him to bring something in which to wrap the children; that prisoner went to an out-house and brought him a quilt or a sheet, which he used for that purpose; that witness walked about in the room;

that everything was bloody; that he did not notice the bloody tracks; that she may have had hold of some of the bloody clothes; and did not recollect to have seen the prisoner with any of the children in her arms; that there was but one room in the house, in which the prisoner and family slept.

William Judge deposed that the purse exhibited on trial was seen by him in the possession of Dr. Longon, the week previous to his death; that he had examined the purse in consequence of a proposal to swap; the purse then contained only two or three dimes, and when exhibited on trial had no visible stains of blood on it.

Mr. Perry, a witness called on the part of the defense, testified that he was at Brown's when prisoner arrived there on the night of the murder; it was about three o'clock in the morning; witness informed the inmates at Brown's that some robbers had murdered Dr. Longon and family; prisoner lingered at the negro quarters about fifteen minutes, before she went to the house, and when she entered she stopped near the door; she was asked to come near the fire, where witness and others were standing; she did not advance to the light, but retreated into a dark corner of the room, out of the light; she made contradictory statements about the murder, and witness suspected her guilt at Brown's; did not observe blood on her dress; prisoner, in speaking of the murder, said, that Dr. Longon had suspected that robbers would come, from the barking of the dogs, and had placed a broad-axe near the head of his bed; he saw prisoner carry one of the children as far as the gate in front of the house; thought the child was wrapped in something lying on the bed; the child was bloody, and he did not observe the blood on her dress, until she returned from the house of Mr. Watts.

John Johnson, a witness called on the same side, says, he examined the bloody foot-prints on the floor of Dr. Longon's house, and says they resembled a stocking foot-print, as the toes were not distinctly marked.

From this statement of the testimony, the facts which militate against the accused, and lead to conclusion of her guilt, are :

1. Her presence at the commission of the homicide, and the

perfect means which were at her command, for the accomplishment of her object.

2. The fact, that from the door of the house, in the walk, to the spot where the corpse of Mrs. Longon was found, during the night, after cautious and careful examination, there were discovered but two sets of tracks or "foot-prints," one of which was supposed to be those of the deceased, and the other corresponded with those of the accused.

3. The fact, that at the place where the homicide was committed, the traces of a scuffle were visible, and the prints of feet were discovered, which corresponded with the tracks of the accused.

4. The fact, that from the point at which the corpse was found, to the gate, there was found but one set of tracks, and they corresponded with those of the accused.

5. The prisoner's declining to advance into the light at Brown's, where the witness Perry was standing with others, and her retreat into a dark corner.

6. The statement prisoner made to witness, James E. Watts, in the road between Longon's and Brown's, before any suspicion of her agency in the murder had arisen in the mind of the witness. She stated, that after the robbers had killed Longon and his family, Mrs. Longon and herself ran out of the house, and were pursued by the robbers, who overtook Mrs. Longon and killed her where she lay; but that she outran Mrs. Longon and escaped, and ran over to Brown's.

7. The stains of blood upon the front of her dress. Witness says, "There were many specks and spots upon it."

8. The blood-stain upon the pantaloon-pocket of Longon, coupled with her possession of his purse, secreted, and her ignorance of the amount of its contents.

9. The improbable version she gave of the whole transaction, and her palpably contradictory statements.

The question which naturally presents itself is this: Can all of these facts, distinctly proven, stand, and yet the prisoner be guiltless of the homicide.

It is, in the first place, objected, that the presence of the prisoner, who would necessarily have been there, whether guilty or innocent, creates no presumption of her guilt; and that the ab-

sence of any sufficient motive for the commission of so dreadful a crime, is a circumstance strong in her favor. It is difficult to estimate the force of any motive, which may arise in any given case. We have evidence from painful experience, that a desire to possess the wealth of another has often constituted the operative motive for the perpetration of the deepest crimes. The prisoner may have been ignorant of the amount of money which Longon possessed, or the glittering contents of the purse may have presented a temptation which she did not resist. We are forced to infer that the acquisition of the purse, with the attendant circumstances, formed at least a part of her motive.

Again it is urged, that the existence of the foot-prints, in the walk from the door to the point where the dead body was found, and from thence to the gate, is in harmony with prisoner's statement, and must have existed if her statement were true. This assumption is directly rebutted by the facts. If Mrs. Longon were slain by the robbers, who rushed from the house in pursuit of the fugitives, there must have been other tracks made in the walks besides those of the two persons in flight, and the place where the blow was struck and the victim fell, which bore evidence of a scuffle, would also have been eloquent of the presence of her murderers.

It is also insisted, that the stains of blood upon her dress, as that circumstance may be accounted for in various ways, consistent with the innocence of the accused, creates no presumption of her guilt. Her own explanations are unsatisfactory and untrue. It did not proceed from the old wound on her finger, as she at first stated and afterwards denied. It is highly improbable, that these stains were contracted from the quilt which the witness Williams had sent her for to wrap the children in. The stain on the sleeve of her dress may have proceeded from that source, or have been contracted by carrying the children; but, how are we to account for the "many specks and spots" on the front of her dress? From the testimony of Newsom, it is inferable, that the blood at the time when the children were sent to Watts' house, appearing in different parts of the house, where the murder of Longon and child was committed, was congealed. If these stains had

been contracted from the bed-furniture in which the children were enveloped, they would have appeared like the stain on the sleeve, as if produced by rubbing against a bloody article. The "specks and spots" upon her dress were probably produced by the blood gushing from the veins or arteries of the murdered victim. The conduct of the accused at Brown's can only rationally be accounted for upon the supposition of conscious guilt. "She retreated into a dark corner," after having lingered some time at the negro quarter, before she told her tale. Judging from the emotions of horror and fear, with which an innocent female would have been oppressed, who had witnessed such a scene as the prisoner described, we may well suppose she would have rushed to the light and sought protection from the friendly persons whom she saw there. Then, why did she retreat into a dark corner? To this question, there is but one satisfactory answer to be given; she feared that an exposure to the light would detect the evidence of her participation in the murder.

Again, it is insisted that the fact of the purse of Longon having been found upon her person is no evidence of her having murdered Mrs. Longon; that she might have obtained the purse and the money in the manner related by her, or have received it from the person who committed the homicide, on Longon. Her ignorance of the amount of money it contained is a strong argument against the truth of her statement, which she in fact contradicted after she was taken into custody. If, say the prisoner's counsel, she did actually take the purse from the pantaloon pocket, it would probably have been blood-stained, as the hand that withdrew it was bloody, and the purse was unstained. If the hand of the prisoner grasped the handle of the axe with which the blow on Longon was inflicted, the back of the hand would have received the blood, which, upon the stroke, flowed from his arteries. This supposition accounts for the manner in which the pocket was stained, "as if," says the witness, "a bloody hand was thrust into it." Again, say the counsel, if the prisoner took the purse from Longon's pocket, she must have returned into the house, after having pursued and overtaken Mrs. Longon in the walk, and would consequently have left "foot-

prints" pointing to the house. The evidence shows that the house could be approached in any direction save that of the gate, without leaving signs. If the prisoner had returned into the house by passing along the walk, after murdering Mrs. Longon, she would have left additional and conclusive evidence of her guilt. We may suppose, therefore, that she would naturally, after passing out at the gate, return in some other direction. And this view is strengthened by the discovery of her tracks immediately in the rear of the house. The evidence of James E. Watts renders it highly probable, if not certain, that the broad axe was used in the slaughter of Longon. It was bloody, and but one blow was given, which severed the head and some of the fingers of Longon, and wounded his child, which witness supposes to have been, at the moment, asleep in his arms. The instrument must have been broad, or this effect could not have been produced by a single blow. It would have been strange, if five persons in concert had entered the house for the purpose of doing robbery and murder, without suitable implements to effect their purposes. The statement of the prisoner, in reference to this point, is not unimportant. To Perry she said, that Longon had suspected that robbers would come that night from the barking of the dogs, and had placed a broad-axe near the head of his bed. Why such a suspicion, from so ordinary an occurrence, in the midst of a peaceable community? The jury might well have inferred that this was only an attempt to forestall any suspicion against herself, which might arise from the position of the axe where she knew it was left.

These facts, all of which are independent, could not exist in harmony with the assumption of the innocence of the accused. One circumstance, in addition to those, the objections to which we have above noticed, is this,—and to our minds it is strongly indicative of the guilt of the prisoner. She says, that after the robbers had killed Dr. Longon, Mrs. Longon and herself ran out of the house, and were pursued by them, "who overtook and killed Mrs. Longon where she lay; but that she outran Mrs. Longon and escaped, and ran over to Mr. Brown's." If the statement of four witnesses be true, this statement was false; but its falsehood is not the most damnatory feature. It supposes

a knowledge of a fact which the darkness and the flight of the prisoner rendered impossible. It was evidently an effort to give a statement of the transaction which would comport with her assumed innocence. The prisoner might have imagined that Mrs. Longon had been slain by her pursuers; but how did she know that the corpse lay where the murder was committed, if she ran over to Mr. Brown's after having escaped?

In cases depending upon indirect testimony, where the facts or circumstances established by direct proof point strongly to the guilt of the accused, his relation of the occurrence is frequently a matter of great importance. His statement, if true, may explain facts of a doubtful character which otherwise would tend strongly to the conclusion of his guilt; and if it be reasonable and consistent in itself, should always have weight with the jury. On the other hand, if it be unreasonable or contradictory, and proved to be false, it must, upon acknowledged principles, increase the presumption of his guilt. In the case at bar, the evidence, strong, if not conclusive, derives great weight from the strange account which she gave of the occurrence, from the contradictory statements, and from the fact that her relation, in part at least, is proved to be false. Ignorant or weak-minded persons, innocent of the charge, when opposed by circumstances that question their innocence, not knowing that a true account of the matter would be their surest protection, frequently resort to prevarication and falsehood, with a hope of delivery. But in the case under examination there is good reason to believe that the false and contradictory statements of the prisoner were the result of the guilt in which she was involved. Upon the whole, looking at the testimony with that degree of scrutiny and caution, with which circumstantial evidence should be received in a prosecution for a crime of this magnitude, we think the verdict was right, and, therefore, affirm the judgment.