[Crim. No. 133.   Third Appellate District.—July 30, 1910.]

## THE PEOPLE, Respondent, v. JOSE VERDUZCO, Appellant.

CRIMINAL LAW—MURDER—SUFFICIENCY OF EVIDENCE TO SUSTAIN VERDICT.—Where the defendant charged with murder in the first degree was found guilty as charged, and upon appeal claimed insufficiency of the evidence to sustain the verdict, and the evidence all tended to show that there was a common understanding between defendant and his brother, regarding hostility of the deceased manifested especially toward defendant's brother, and that one of them committed the crime, and two eye-witnesses to what occurred testified

that defendant said: "What's with my brother is with me," and that defendant then fired the fatal shot, the evidence is sufficient to support the verdict.

ID.—PROVINCE OF JURY—CREDIBILITY OF WITNESSES—PROBABILITY OF TESTIMONY.—Where there is nothing in the testimony of the eye-witnesses to the homicide not susceptible of reasonable explanation in the light of all the evidence, it was wholly within the province of the jury to pass upon their credibility, as well as the probability of their testimony.

ID.—INSTRUCTIONS—AIDING AND ABETTING HOMICIDE.—Where the defendant claimed that his brother, who escaped, fired the fatal shot, and the prosecution, besides relying upon proof that defendant fired the same, relied also upon a prior understanding between defendant and his brother to make a felonious assault upon deceased and to aid and abet each other in the homicide, the court properly gave instructions based thereon, to the effect that if they were satisfied beyond a reasonable doubt that defendant and his brother did make such assault, "with the defendant and his brother aiding and abetting each other therein, and during such assault Soto was shot, killed and murdered by one of said assailants, according to a common prior understanding, then under such circumstances, . . . no matter which of the two assailants fired the alleged fatal shot, both are equally guilty under the law."

ID.—INSTRUCTION AS TO REASONABLE DOUBT.—An instruction as to "reasonable doubt" which showed no material departure in phraseology or substance from the frequently approved instruction given by Judge Shaw in the Webster case was without error.

ID.—INSTRUCTION AS TO DUTY OF EACH JUROR—CONSULTATION—AGREEMENT.—The court did not err in an instruction the essence of which is that each juror should decide for himself; but that it is his duty to consult with the other jurors, and counsel with them "with the view of reaching an agreement, if they can without violence to their individual understanding of the evidence and instructions of the court"; but if convinced that his views are erroneous, a juror should defer to the views or opinions of the other jurors.

APPEAL from a judgment of the Superior Court of Madera County, and from an order denying a new trial. W. M. Conley, Judge.

The facts are stated in the opinion of the court.

R. E. Rhodes, and G. W. Mordecai, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

CHIPMAN, P. J.—Defendant was charged by information with the crime of murder, was convicted as charged and sentenced to imprisonment for life. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

The homicide occurred on the night of July 4, 1909, at the house of one Jesus Belmontes and his wife, Catalina, with whom defendant and his brother, Seferino Verduzco, and deceased, Constantino Soto, were at the time living, the last three named being laborers and working at a mill near· the town of Madera. It appeared by the testimony of Mrs. Belmontes that deceased had his supper about 5 o'clock and left the house. Defendant and his brother had supper about half an hour later and also left the house. About 8 o'clock, or shortly after, deceased and Seferino returned to the Belmontes house, deceased entering immediately behind Seferino. The deceased sat down upon a bench near a table and Seferino went to his room, where he remained about five minutes. He re-entered the room where deceased still sat upon the bench and as he passed out he said to deceased: "I don't want any business with you," and the deceased replied: "Neither do I with you." Mrs. Belmontes testified: "In about ten minutes the two Verduzcos returned, Seferino Verduzco and Joe Verduzco. . . . Jose Verduzco in front and Seferino Verduzco behind, both entered about the same time . . . and when Joe entered he said: 'What's up? What passes?' . . . When Verduzco said, 'What's up, what passes,' the deceased replied, 'Nothing is up, nothing passed.'" He was at that time sitting on the same bench where Seferino left him. Mrs. Belmontes was sitting on the opposite side of the table with a child in her arms. She testified that Jose passed one side of her and Seferino on the other toward the bench where deceased sat. When these words passed between Jose and deceased Mrs. Belmontes' husband came out of the bedroom adjoining and placed himself at a point between Seferino and deceased, the latter meantime having arisen to his feet. Mrs. Belmontes testified: "Q. Did any words pass at that time? A. No, sir; when my husband got in between he said: 'What are you going to do?' When Jose Verduzco replied: 'What's up with my brother is with me.' Jose Verduzco then fired the shot." Deceased died from the effect of the wound in about one hour.

Jesus Belmontes testified: "When I heard them saying, this' man saying, 'What's up, what passes,' is when I came out and told them I did not want any trouble in my house. Q. Who were in the room when you came out? A. Jose Verduzco and Seferino Verduzco; Soto was there and my wife. Q. Where was Seferino Verduzco? A. He was at one side of the table and they surrounded him from each side. . . . Q. Did you see any weapons in the hands of either one of the Verduzco boys? A. When Jose Verduzco said, 'What is with my brother is with me,' they were close in on him and Seferino had a knife and then I got between him and Seferino. I got in between Jose and Seferino, saying, that they wouldn't strike him, and then the deceased turned around as he indicated by his gestures, toward Jose Verduzco, and then he fired the shot. . . . Q. How did you know that Seferino had a knife? A. Because I saw it when he took it out to strike him. Seferino was nearest to my bedroom. Q. Did you see the flash of the shot? A. When I knew it was a shot, just because I heard the sound and my face was dazed in fire, when I got between Seferino and Jose to defend him against the knife. Q. Did you see the flash come from Jose or Seferino? A. From Jose. I went to the door quickly and pulled the door to and hollered for help." Defendant and his brother immediately went to this door, forced it open and Seferino escaped and has not been heard of since. Jose returned to the Belmontes house and was there arrested about 10 o'clock the same night.

On the 8th of July, following the homicide, defendant made a voluntary statement under oath, in which he claimed that at the request of his brother, Seferino, he went to the Belmontes house; that he was entering the door as he heard a shot and two men ran out whom he did not recognize; that he did not see his brother in the room where the shot occurred and that he did not see him afterward; that Mrs Belmontes had denounced him (Jose) as the perpetrator of the killing, but that he was wholly innocent; that he knew of no trouble between deceased and his brother, Seferino, and there was none between deceased and himself. On the 7th of August following he made another voluntary statement, at variance with his former statement, in which he repeated a conversation he had with his brother, Seferino, in which the latter

spoke of some altercation between him and deceased after
which Seferino told him of their going to the Belmontes house
together and of Seferino entering his room and coming out
again and leaving the house; that not long after, the two
brothers returned to the house, and that deceased uttered
''some malediction toward his brother,'' and his brother shot
him.   It appeared that the three men came from the same
part of Mexico and had known each other there, but there
was no evidence of any quarrel between them except as above
stated.   The evidence all tended to show that one of the two
Verduzco brothers committed the crime, and the only other
witnesses to the tragedy both testified that defendant was
the one who fired the fatal shot.

The evidence is challenged as insufficient for its inherent
improbability because, as was shown, defendant had borne an
excellent character for peace and quiet; that the younger
Verduzco fled and defendant stood his ground, conscious of
innocence; that defendant had had no trouble of any kind
with deceased, and had no ill-feeling toward him, while his
brother entertained feelings of hostility toward deceased and
was a person of violent temper; that defendant is not shown
to have had a pistol, while it did appear that his brother
could, and probably did, procure the weapon when he went
into their bedroom, as narrated by the witnesses; that it is
improbable that Belmontes would have pursued Seferino and
paid no attention to Jose if it be true, as he testified, that
Jose fired the shot; that the witness Catalina Belmontes first
stated to witness Bancroft, who came to the house soon after
the affray, that Seferino fired the shot, and that her explana-
tion why she did this and afterward accused Jose is not
satisfactory; that Belmontes was shown to have been too deaf
to have heard what he testified to, and furthermore that his
wife first stated that he was in bed when the Verduzcos en-
tered the house.   We shall not undertake to reconcile the
alleged improbability of the testimony of the two witnesses
to the homicide or point out how the jury might have been
able reasonably to do so.   Not the slightest suspicion was by
the evidence cast upon anyone but one or both of the Ver-
duzcos as the perpetrators of the crime.   Jose's statement,
upon entering the room with his brother, that ''What is with
my brother is with me,'' coupled with the other proven facts,

was sufficient justification for the jury to infer a common understanding between Jose and Seferino when they confronted the deceased. We find nothing not susceptible of reasonable explanation, in the light of all the evidence, which seriously conflicts with the truth of the narrative of the killing as given by the only two eye-witnesses. The responsibility of passing upon their credibility as well as upon the probability of their testimony was upon the jury, and we can find no warrant in the record for assuming this responsibility.

The court instructed the jury that if they were satisfied beyond a reasonable doubt that deceased was killed by the inflicting of a gunshot wound, and that, immediately prior thereto, defendant and his brother "reached an understanding that they two together would commit a felonious assault upon said Soto and would kill and murder him, and that in pursuance of said understanding said defendant and his brother Seferino Verduzco did make such assault upon Soto, with the defendant and his brother aiding and abetting each other therein, and during such assault Soto was shot, killed and murdered by one of said assailants according to a common, prior understanding, then, under such circumstances, the court instructs you that no matter which of the two named assailants fired the alleged fatal shot, both are equally guilty under the law." The court also in this connection instructed the jury: "If there exists in your minds a reasonable doubt as to whether the defendant shot and killed the deceased, then you shall find defendant not guilty, unless you are convinced from the evidence to a moral certainty and beyond a reasonable doubt that the defendant aided and abetted, or advised and encouraged another in the commission of the crime. In this connection you are instructed if you believe from the evidence that the deceased was unlawfully killed by Seferino Verduzco and there exists in your minds a reasonable doubt as to whether the defendant aided and abetted, or advised and encouraged the commission of the crime, then your verdict must be not guilty."

It is true that the prosecution relied upon the evidence that the fatal shot was fired by defendant, but it also relied upon a common understanding between the brothers Verduzco. Furthermore, the contention of defendant was that defendant's brother, and not defendant, was the guilty assailant and

fired the shot. The evidence presented the case where there might be doubt as to which one of the two assailants was the immediate cause of the killing, and notwithstanding such doubt, both might be equally guilty if the jury found the facts to be as pointed out in the instructions complained of. We see no error in these instructions.

Error is assigned in the giving of the instruction on reasonable doubt. We can discover in this instruction no material departure in phraseology or substance from the stereotyped and frequently approved instruction that has come down to us from Judge Shaw in the trial of Professor Webster. The statements that "everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt," and that the reasonable doubt referred to "is that state of the case," etc., have too often survived the criticism to which they have been subjected to leave their correctness any longer in doubt.

The court instructed the jury as follows: "In conclusion, you are instructed that if, after a full consideration of the entire evidence in this case, any juror should entertain a reasonable doubt of the guilt of the defendant, it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty, nor to be influenced in so doing for the single reason that a majority of the jury should be in favor of a verdict of guilty. In this connection you are instructed that juries are impaneled for the purpose of agreeing upon verdicts if they can conscientiously do so. They are admonished at each recess of the court not to form an opinion as to the merits of the case until it shall be finally submitted to them, and when it is so submitted it is the duty of jurors to deliberate and consult together with the view of reaching an agreement, if they can, without violence to their individual understanding of the evidence and instructions of the court. It is true that each juror must decide the matter for himself, yet he should do so only after a consideration of the case with his fellow-jurors, and he should not hesitate to sacrifice his views or opinions of the case when convinced that they are erroneous, even though in so doing he defer to the views or opinions of others."

The objection to this instruction is aimed particularly at the concluding paragraph, by which it is urged that the in-

dividual juror was required to render a verdict on the opinion of his fellow-jurors. The essence of the instruction is that each juror should decide for himself, but that it is his duty to consult with the other jurors, counsel with them, "with the view of reaching an agreement, if they can, without violence to their individual understanding of the evidence and instructions of the court." But if convinced that his views are erroneous, a juror should defer to the views of others. It is claimed that the instruction is "diametrically antagonistic" to the rule announced in *People* v. *Dole*, 122 Cal. 488, [68 Am. St. Rep. 50, 55 Pac. 585], where the court held that an instruction, as asked, should have been given, which said, among other things: "If after a consideration of the whole case, any juror should entertain a reasonable doubt of the guilt of the defendant, it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty, nor to be influenced in so doing for the single reason that a majority of the jury should be in favor of a verdict of guilty." The difference between the two cases is obvious. In the instruction now before us the very proposition laid down in the Dole case is stated, and it was only when the juror should become convinced that his views of the case were erroneous that he was told that he should defer to the opinions of the other jurors.

We discover no prejudicial error in the record, and the judgment and order are therefore affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 20, 1910.