[Crim. No. 137.    Third Appellate District.—February·16, 1911.]

## THE PEOPLE, Respondent, v. T. H. MUHLY, Appellant.

CRIMINAL LAW—CONVICTIONS UPON CIRCUMSTANTIAL EVIDENCE—QUESTION OF LAW—PROPER INSTRUCTION—RULE NOT UNIVERSAL.—The rule applied in the case of *People* v. *Staples,* 149 Cal. 405, [86 Pac. 886], presents a question of law which may be properly given as an instruction to the jury in a case of circumstantial evidence, and was so given in this case; yet it is not intended to be of universal application in the appellate court where convictions are had upon circumstantial evidence.

ID.—PROPER RULE OF REVIEW UPON APPEAL—REASONABLE INFERENCE OF GUILT—INFERENCE OF INNOCENCE—QUESTION FOR JURY.—Where the circumstances are such as to reasonably justify the inference of guilt, the case will not be taken from the jury because an inference of innocence might also have been drawn.  The jury must choose between these two inferences.  It is only where the evidence does not warrant the inference of guilt that the appellate court will interfere.

ID.—SUFFICIENCY OF EVIDENCE—SUPPORT OF VERDICT—ACTION OF TRIAL JUDGE.—It is held, upon a review of the evidence, that the jury were justified in finding the defendant guilty of manslaughter, and that it was well for him that owing to a former conviction of manslaughter he could not be convicted of any higher offense, as the evidence warrants a conviction of murder.  It is also to be considered that the trial judge, after sitting through three trials of the case, was so impressed with defendant's guilt as not only to deny a new trial, but also to disregard the jury's recommendation for mercy in imposing sentence upon the defendant.

ID.—PROPER REFUSAL OF REQUESTED INSTRUCTION EMBODIED IN CHARGE. The court did not err in refusing an instruction requested by the defendant, where a similar instruction is embodied in the charge which is as favorable to the defendant as the instruction requested.

ID.—REQUESTED INSTRUCTION AS TO MOTIVE PROPERLY REFUSED—INVASION OF PROVINCE OF JURY.—A requested instruction as to motive as

an important factor in cases involving circumstantial evidence, that "the question of motive becomes important, if not controlling, as showing the cogency of the circumstances, and in such cases it is necessary that the facts be established, from which motive may be implied, and that a motive cannot be supplied by mere speculation," was properly refused, both because motive is not indispensable to a conviction and because the requested instruction invaded the exclusive province of the jury by charging them upon a question of fact.

APPEAL from a judgment of the Superior Court of Madera County, and from an order denying a new trial. W. M. Conley, Judge.

The facts are stated in the opinion of the court.

Ernest Klette, and Frank Kauke, for Appellant.

U. S. Webb, Attorney General, and George Beebe, Deputy Attorney General, for Respondent.

CHIPMAN, P. J.—Defendant was charged with the murder of one James H. Bethel, alleged to have been committed on or about February 28, 1908, at the county of Madera. The jury found him guilty of manslaughter and recommended him to the mercy of the court. The sentence of the court was ten years' imprisonment at San Quentin. Defendant appeals from the judgment of conviction and from the order denying his motion for a new trial.

1. The principal point upon which a reversal is asked is that the evidence was insufficient to justify the verdict. At a former trial the defendant was convicted of manslaughter. On appeal the judgment was reversed. (11 Cal. App. 129.) At the last trial the court properly instructed the jury that if they believed from the evidence beyond a reasonable doubt that the defendant was guilty as charged, they must find him guilty of manslaughter. The defendant may deem himself fortunate, if guilty, that at his first conviction the jury by their verdict rendered impossible his conviction upon a subsequent trial of the higher crime, for the evidence tended to show a brutal murder by someone, with no accompanying circumstances pointing to any less crime than murder. While it is concededly true that the homicide, as viewed from

the evidence was murder, it is strongly urged that the evidence fails to connect the defendant with it.

The evidence of defendant's guilt is circumstantial. Reliance is placed upon the rule stated in *People* v. *Staples,* 149 Cal. 405, 425, [86 Pac. 886]. We quote: ''Where the evidence is of such a character [circumstantial] it must be not only consistent with the hypothesis of guilt, but inconsistent with any other rational hypothesis. The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court.'' This statement of the rule suggests a very serious question arising under the constitutional provision which makes the jury the exclusive judges of the facts. Where there is a series of circumstances from which, as is claimed here, guilt is made to appear, is it not the province of the jury to determine whether or not ''every circumstance relied on as incriminating is equally compatible with innocence''? Under what condition in a particular case may the court assume the functions of the jury and determine that each of the numerous circumstances, relied on as incriminating, is, or that all of them taken together are, equally compatible with innocence, and, therefore, the verdict is not sustained? In the case now here the defendant presents in numerical order most, if not all, of the circumstances relied on for conviction, and endeavors to show each of these circumstances to be equally compatible with innocence, and hence there is a failure of proof necessary to sustain a conviction. The principle enunciated in the Staples case is undoubtedly proper to be given as an instruction to the jury, and it was given by the learned trial court in unmistakable terms. But we do not think it can be accepted, or was intended to be accepted, as a rule of universal application to guide the appellate court in all cases arising out of or dependent upon circumstantial evidence. It rarely happens that circumstances attending the commission of a crime may not, in the opinion of the reviewing court, reasonably be susceptible of an interpretation compatible with the innocence of the person associated with such circumstances; and if one after another of the alleged incrim-

inatory circumstances may be eliminated, they would necessarily cease to have any probative force considered collectively.

There is always an atmosphere around the circumstances of every case, as it is being presented to the jury, which is dissipated by the appeal. This atmosphere is not always conducive to impartial action by the jury, but ordinarily it tends to just inferences and conclusions from the evidence adduced, and unless it otherwise appears, it must be presumed that such inferences and conclusions were fairly deducible from the circumstances disclosed. Take some of the circumstances shown in this case, for example, the conduct and demeanor of the accused, at the coroner's inquest and afterward, conscious of resting under suspicion; or, consider the fact of defendant's opportunity to commit the crime; or, that he was the owner of the gun which probably was used in killing the deceased; or, that the defendant made some apparently hostile declaration about the deceased, some time previous to his death; or, that defendant knew of the homicide shortly after it occurred, to wit, about 8 o'clock in the evening, and did not inform his neighbors of the fact until the next morning, but left the body lying on the ground unprotected during a very stormy night; each of these circumstances may be reconciled with innocence. But are not the jury the judges of the inferences to be reasonably drawn from the circumstances? As we understand the Staples case, the rule there laid down followed an analysis of the evidence from which the court was authorized to conclude that there was no evidence warranting the verdict. We do not understand that case to hold that where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn. Between these two inferences the jury must choose, and it is only where the evidence obviously does not warrant the inference of guilt that the court will interfere. This must be so, or the weight of the circumstantial evidence, and the inferences to be drawn from it in almost every case, must finally be determined by the appellate court, thus making the court the arbiter of both law and fact. In our judgment, a verdict of a jury, and the judgment of conviction based upon circumstantial evidence,

come to us as any other verdict and judgment, clothed with like presumption of support; and unless we can say that the inference of guilt drawn from the evidence was wholly unwarranted, we cannot interfere.

It appears from the evidence that deceased was an old man, unmarried, aged seventy-five years; he boarded with defendant, who with his wife and children lived in a house about one hundred and seventy-five feet from a roadside house in which deceased lodged and kept a saloon, and some articles of merchandise; on the evening of February 28, 1908, deceased took supper with defendant's family at about 7 or 7:30 o'clock and went thence to his saloon; a few minutes later, and while defendant was helping in the kitchen, defendant heard a shot. All we know of what happened we learn from witnesses at the trial who were present at the inquest, on February 29th, following the homicide, and heard the defendant testify and who narrated what he testified to; also, from some statements made by defendant to witnesses apart from his testimony at the coroner's inquest.

Witness W. A. Ellis had some conversation with defendant about the homicide, on Monday, the twenty-ninth day of February, the day of the inquest, and he was present and heard defendant's testimony at that time. Ellis testified:

"Mr. Goucher: Q. Mr. Ellis, were you present on the twenty-ninth day of February or on the first day of March, 1908, in the Bethel saloon at the time the defendant testified before the coroner's jury? A. Yes, sir.

"Q. Do you remember any remarks that he made, any conversation, if any such conversation happened, between you and this defendant touching a shotgun? A. Yes, sir.

"Q. Will you state what that conversation was? A. There was some conversation in regard to the gun and he turned around to me and said, he says: 'You know the gun, Will,' he said, 'It is that Benson gun,' and I said: 'Yes, I know the gun.'

"Q. You knew by that remark and you answered him accordingly what kind of a gun he referred to?

"Mr. Kauke: We object to what the witness knew.

"The Court: He said he knew the gun, he has already answered, he said he knew by Benson's gun, he knew what gun it was.

"Mr. Goucher: Do you know whether it had any other besides Muhly and Benson before it became the property of either?

"A.   Yes, sir.

"Q.   Whose gun was it?

"Mr. Kauke: We object, it is immaterial.

"The Court: The objection will be overruled.

"Mr. Goucher: Prior to the time that either Benson or Muhly owned it?

"A.   Charlie Ellis owned it.

"Q.   Is that Charles A. Ellis, a brother of yours?   A. Yes, sir.

"Q.   Can you describe the character or caliber or gauge and make of the gun?   A.   Yes, sir.   I can.

"Q.   Please do so.   A.   Well, the gun was a 12-gauge Remington shotgun and it was a 32-inch barrel gun, pretty good gun for—a gun that cost perhaps thirty-five or forty dollars.

"Q.   Remington make?   A.   Yes, sir.

"Q.   Twenty-three gauge?   A.   Yes, sir.

"Q.   Was it hammerless or a hammer gun?   A.   It was a hammer gun.

"Q.   Did you ever see Mr. Muhly in possession of that gun prior to the day of the inquest?   A.   I don't remember ever seeing him with the gun.

"Q.   Mr. Ellis, do you remember the testimony in a general way given by Mr. Muhly at the coroner's inquest?   A. In a general way, yes, sir.

"Q.   Well, will you state what he said so far as any account of the shooting or alleged shooting of James H. Bethel was concerned as to his own movements, as to the time, and as to the circumstances?   A.   Well, he said that the baby had been sick that afternoon and that they had supper pretty late, I think he said about 7 o'clock, and Mr. Bethel came down to the house and ate supper, and after supper he went into the living-room or sitting-room and stood by the fireplace a little while and went up to the saloon, where he slept.

"Q.   That is, by 'he,' you mean, that is accounting for the movements of Bethel?   A.   Yes, sir.

"Q.   According to Mr. Muhly's testimony?   A.   Yes, sir, and shortly after he went up to the saloon while Mr. Muhly

was in the kitchen washing dishes and he said that he heard a shot, and he went out the back door of the kitchen and around to the corner of the kitchen perhaps twenty seconds after the first shot, why—no, just as he got to the corner of the building he heard some scuffling on the porch and heard the old man say, 'Don't do that, boys, don't,' and then he heard another shot, and he went further over to the chicken-house, part way between the barn and house and saloon building, and stood there for a few minutes, perhaps fifteen minutes, and went back to the house and stayed there for perhaps an hour, and then he went back to the saloon and he seen the body of Mr. Bethel lying there on the ground, and he said he did not see him move nor he could not see him breathe and he thought he was dead, and he went back to the house and told his wife he guessed the old man was killed, and they went to bed.

"Q. Do you remember whether he said when, if he did visit at all, the scene when the time was that he visited the place where Bethel's body lay? A. He did not say the time, but about one hour after the shooting.

"Q. No, I am not speaking about that; after he said he went to bed, did he say in that testimony when he next saw Bethel's body? A. Yes, sir.

"Q. Go ahead. A. The next morning.

"Q. Well, what did he say about it? A. He said he went up there and seen the body lying there and I don't just remember whether he said he or his wife took a blanket off of the card table and covered the body up and he went up to Mr. Blazer's to notify them.

"Q. Did he inform you or any other hearer there while testifying before that coroner's jury as to seeing anybody else besides Mr. Bethel, seeing anybody engaged in this fight or in the killing? A. I believe that he did see some forms on the porch, but it was too dark, he could not see who they were nor how many there was, nothing definite.

"Q. Do you remember whether he represented that he saw any forms prior to the second shot or was it after the second shot? A. No, sir; he did not.

"Q. Do you know where the chicken-house is with reference to, I mean the dwelling-house where Muhly lived? A. Yes, sir.

"Q.  Could you indicate on the map?  A.  Yes, sir; it is marked 'dwelling.'

"Q.  This is the Muhly house and the chicken-house is where—  A.  The chicken-house—this is the chicken-house (showing).

"Q.  Did he indicate in a statement where he was, when he went up in that direction after the second shot?  A. Well, he said he went up near the chicken-house.

"Q.  Near the chicken-house?  A.  He did not say just exactly where, up to the chicken-house; I think those are the words he used, to the chicken-house.

"Q.  Did he in the course of that testimony make any reference to a shotgun?  A.  Yes, sir.

"Q.  Just state what he said.  A.  As I have already stated, he spoke about the gun.

"Q.  That was in a conversation, a side conversation to you, but in his testimony outside of that, did he say anything about having a shotgun or where the shotgun was that night?  A.  Yes, sir.

"Mr. Kauke:  We object to that; he has answered it.

"The Court:  That is when he was on the witness-stand— the objection will be overruled.

"The Witness:  Shall I be permitted to explain?

"The Court:  Yes.

"A.  When he turned to me and said, or asked me or told me that I knew the gun, that was while he was on the witness-stand, while he was being questioned.

"Mr. Goucher:  Q.  I mean the rest of his testimony, outside of what he said to you, I am asking about that.  A.  Yes, he said he had a gun, and that the gun was down to the house that morning, I believe, and that he said the gun was generally kept down to the house, and that he had taken the gun up that morning to Mr. Bethel's, that Mr. Bethel used the gun to shoot quail with. ·

"Q.  Did he say anything about the then whereabouts of the gun while he was a witness?  A.  He said that he looked for the gun and could not find it, did not know where it was.

"Q.  Do you remember whether he stated about what hour it was or about what time in the day when the gun was taken up to Bethel's?  A.  He said in the morning.

"Q.  In the morning?  A.  Yes, sir.

"Q.  Did he say when he had looked for the gun, whether he had looked for it the night of the shooting or the day after or what time?   A.   I don't remember as to his saying what time he had looked for it'.

"Q.  Did you take any part in the search at Bethel's saloon, or store?   A.   Yes, sir.

"Q.  Do you know whether that shotgun called by you the Benson gun and which had formerly belonged to your brother was found up to the time that the coroner's jury finished its investigation?   A.   It was not found; no, sir."

This is about as full and clear a statement of what was said by defendant at the inquest as appears in the record.   Other witnesses also testified as to what defendant testified to. They differ in some respects from the account given by Ellis but not materially.

The autopsy showed that a part of one charge of bird shot, No. 7 or 8, struck the deceased on the side of his face and head, and that a second charge struck the side of the saloon, and came from the direction of defendant's house, as was indicated by the perforations in the building.   Death, however, was caused by the crushing of the skull of deceased with some blunt instrument, leaving parallel marks, which indicated probably that the instrument used was a double-barreled gun. There was evidence of empty No. 12 cartridges being found on the ground near the scene of the homicide similar to cartridges produced by defendant at the inquest and not unlike some found in the saloon.   Under-sheriff Hensley spent some nine days in the neighborhood, before defendant's arrest, investigating the circumstances of the homicide, and searching for the gun.   He had some conversation with the defendant on the subject.   On one occasion he asked defendant to assist him in his search for the gun, and defendant replied, "He said he did not care to, do that, that he would not find his own gun if he could; he says, 'Inasmuch as I am suspicioned anyway,' and of course I said a good deal urging him to make suggestions to me or my men the probable hiding place and so forth, and give me the benefit, possibly, of his experience as a hunter of hidden things, and finally he said to me, we had walked some little distance, that his idea of hidden things was— . . . Q.   Well, go ahead and state what Muhly said.   A.   He stepped back a little distance at the end of a

log. He says, 'For instance, you dig down there you will find a pot, and in that pot you will find a jar and in that jar is all the valuable papers I have buried,' and he said my idea would be to bury it, would be the safest way to hide it. That is all he said at that time.'' Later the witness dug down as suggested by defendant and found the pot and jar. At a second conversation the witness asked defendant if he, witness, understood defendant to say, when he called for help to search for the gun, that he refused, and defendant answered ''Yes.'' Witness then asked him what caused him to say he ''had been suspicioned,'' and defendant replied, ''Well, when I saw that tearing off the boards off the saloon, I concluded I was suspicioned. Q. Is that all the conversation? A. I asked him why he did not go to the assistance of his partner that night, and he said that he had been taking him out of trouble before and he got tired of it.'' He was asked what troubles he referred to, and he spoke of but one, and that as occurring at the store of Charles Ellis. When the under-sheriff arrested him, about March 9th, defendant ''stepped into the room to change his clothes,'' and witness testified: ''I stepped with him and he said to me, 'And you think I done it?' I said, 'Yes'; that was all there was said.'' One of the persons, Sam Polkenhorn, said by defendant to have been at Ellis' store at the time referred to, and with whom in part the alleged difficulty occurred with deceased, testified that he did not remember to have had any trouble with deceased. Witness J. H. Peabody testified that he saw the deceased about half-past 4 in the afternoon of February 28th, at his saloon, and this is the last time he was seen alive, so far as appears otherwise than through the statements of defendant. This witness testified also to having had a conversation with defendant about the first day of February, a month before the homicide.

''Q. Where did you have that talk with Mr. Muhly? A. Well, it was right alongside the road known as the Bethel garden, a spot where he raised some melons southeast of the house. . . .

''Q. How far from Bethel's saloon? A. I should judge between two and three hundred yards. . . .

''Q. Relate the conversation. A. I drove along there with my wagon and Mr. Muhly was plowing up what is

known as the melon patch, and I asked him what Jim was going to do about raising melons there, and he said, 'God damn him, he never will raise any more melons here,' and that's about all there was said about that. We turned it off to something else, and I didn't pay any more attention to it and went on.

"Q. So far as you remember was there any further conversation? A. What is that?

"Q. Was there any conversation than what you have now related? A. Not in regard to Mr. Bethel or anything of that kind.

"Q. Did you know at that time of your own knowledge whether there had been any melons raised on the particular piece of ground which Mr. Muhly was then engaged in plowing, had it been a melon patch before that? A. Yes, sir.

"Q. For a long time? A. Off and on, I guess for several years.

"Q. Did you recite at any point in that conversation to Mr. Muhly what Bethel's success had been according to his own representations in raising melons as to the value of melons he had raised? A. Yes; he said that Bethel told him he raised a couple of hundred dollars' worth of melons off of that patch.

"Q. And the statement that you have made is what Muhly said on the subject were in the future prospective of raising melons? A. Yes, sir."

There was much testimony by witnesses as to the personal demeanor of the defendant when on the witness-stand and at other times, introduced no doubt to furnish a basis for an inference that he showed a guilty conscience. Other witnesses testified that they had observed no unusual conduct or demeanor in the defendant at these times. These witnesses were, of course, not permitted to give their interpretation of defendant's acts, but they described them as they appeared while he was testifying and at other times.

At his first trial the jury disagreed; at the second trial he was found guilty of manslaughter, and, at the third trial, a like verdict was rendered, with, as stated, a recommendation to the mercy of the court. The trial court seems not to have heeded this recommendation, for it gave defendant the full limit of imprisonment.

We have endeavored to state the principal circumstances upon which the jury reached the verdict of guilty. There were some other circumstances seemingly trifling when considered unaided and alone. Indeed, it is contended that there is not a single circumstance which may not be reconciled with defendant's innocence. Consider, for example, that defendant knew, according to his own story, that deceased was in some sort of serious peril; that he heard a shot at the saloon where deceased was, followed by a cry indicating his danger, and then another shot; defendant returned to his home without further inquiry and remained there for nearly an hour; then went to the saloon and found deceased lying dead on the ground; he left the body as he found it, exposed to the storm, returned to his wife, told his wife and went to bed, and did not inform his nearest neighbor, a quarter of a mile away, until the next morning. Now, consider this manifest indifference to the fate of deceased with his previous declaration to witness Peabody: "God damn him, he never will raise any more melons here"; consider this also with his statement that it was his own gun with which the shots were fired and that it has never been found and that defendant refused to aid in its discovery. Can we say as matter of law that the jury were unauthorized to draw from these and other circumstances any inference of guilt? We think not. Is it reasonable to suppose that the assailants of deceased in some way got possession of defendant's gun at the saloon on the day of the homicide, came back at night, called him out to the porch, fired at deceased and then beat him on the head with the gun barrel until he was dead? And yet defendant says this is what may have happened, and is entirely consistent with defendant's narrative of the circumstances.

We do not think it necessary to further notice the evidence. Our opinion is that the jury were justified in finding the defendant guilty. Some consideration is due to the fact, also, that the learned trial judge, after sitting at three trials of the case, denied defendant's motion for a new trial, and was so impressed with defendant's guilt as to disregard the recommendation of the jury. We should be loath to disturb a verdict upon questions of fact alone, buttressed as this is by the evidence we have pointed out, and by two convictions,

and by the implied opinion of defendant's guilt, inferable from the sentence imposed.

2. Error is claimed because of the refusal of the court to give certain instructions. On page 44 is an instruction upon the law where the case rests upon circumstantial evidence. It was refused and properly, for the court had, fully and very favorably to defendant, instructed the jury in language as strong as used by the supreme court in the Staples case, *supra,* and as favorably as asked by the defendant.

3. On pages 46 and 47 are two instructions, which were refused, upon the question of motive as an important factor in cases where reliance is placed "in whole or in part on circumstantial evidence." The court was asked to tell the jury that "The question of motive becomes important, if not controlling, as showing the cogency of the circumstances, and in such cases it is necessary that the facts be established from which motive may be implied, and that a motive cannot be supplied by mere speculation." Motive is not indispensable to a conviction, and where the court so charged the jury it was held not error. (*People* v. *Besold,* 154 Cal. 363, 369, [97 Pac. 871].) Furthermore, the instruction asked invades the exclusive function of the jury as judges of the facts. The court may not charge the jury upon questions of fact. (Const., art. VI, sec. 9; *People* v. *Glaze,* 139 Cal. 154, 163, [72 Pac. 965].)

4. On pages 36 and 37 and 39 and 40 are instructions given by the court on the subject of reasonable doubt. It is claimed by defendant that they are the same as were given in *People* v. *Verduzco,* 13 Cal. App. 789, [110 Pac. 970]. Defendant adopts the argument made at that time by counsel for defendant, in his attack upon the instructions. We held that they were not erroneous. Rehearing of that case was denied by the supreme court, and we conclude that we may safely dismiss the point without further notice.

5. Some errors of law are assigned as occurring in the admission of certain evidence, but an examination of the record discloses no prejudicial error in any of the particulars pointed out.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.