DISSENTING OPINION ON PETITION FOR REHEARING
HAWKINS, Presiding Justice,
dissenting:
I would grant the petition and affirm Gangl’s conviction.
Delaware Street in McComb is a main, four-lane thoroughfare, running east and west. Marion Road runs north off of Delaware. A block north of Delaware in a one-business building on the corner of Marion Road and Harrison Street, Charles East on August 3, 1985, owned and operated Sav-On Drugs, Inc., a general retail drug store, with ample parking space on the lot surrounding it.
Fred’s Dollar Store was located on the north side of Delaware, its back entrance parking lot about half a block from Sav-On. A filling station was located on the corner of Delaware and Hart Road about half a block from Fred’s.[1]
Around 2:00 p.m. on August 3, 1985, a Saturday, East and Mrs. Marilyn Reeves, an employee, were in the drug store. Tommy McKenzie, another employee, had gone to lunch and was momentarily out of the building. Two young men came into the building. One weighing around 220 pounds had on a “red thermal long-sleeve shirt,” that, according to Reeves, had been turned inside out, and had some kind of emblem on the inside of it. He also had on blue jeans and beige boots.[2] The smaller man was wearing a long-sleeved yellow shirt, jeans and tennis shoes. The larger man had a black pistol, and the smaller man a silver-looking pistol. One of them had a “dirty-looking pillowcase.” They appeared very nervous and excited, and brandishing their pistols, told Reeves and East it was a robbery and demanded drugs and cash. They kept demanding more drugs, specifying: Dilaudid, Demoral, morphine, Schedule II drugs. East told them he did not have but one of these, but it was on the shelf.
After putting drugs in the pillowcase, they told East to lie down. McKenzie came into the building, and one of the robbers told him “to come over here and do what I say or I am going to kill you.” The robbers told Reeves to go to the front of the store and empty the cash register. Reeves emptied one cash register and McKenzie the other, and the money was put in bags. They were told to lie down.
Reeves owned a 1981 model blue Buick with a substitute tag, ZZD-272, on it. One of the robbers demanded her car keys.
Reeves thought the robbers had gone out the front door of the building, and turned to McKenzie and asked out loud, “Why my car, it’s already been stolen once?” When she said that, one of the robbers replied, “Lady, your car will be a couple of blocks from here.”
The large robber was later identified as Kenneth Williams, and the smaller robber Allen Ray Hawkins, both from Birmingham, Alabama. They left in Reeves’s blue Buick. Reeves immediately telephoned the police.
Barry and Deborah Bean were approaching the drug store on Harrison Street and saw the robbers flee the building. They *338 also saw McKenzie, who was a friend, come out of the store and get in his pickup. Bean drove down to Delaware, and then cut back through a parking lot by the Baptist Church onto Harrison Street at the back entrance to Fred’s. They saw an empty blue Buick, later identified as Reeves’s car, parked there at Fred’s. They saw two men running away from the Buick.
There was a white Chevrolet Monte Carlo parked at the service station by the ice machine, backed in, with its front headed east toward the street.
The Beans saw both men crossing Delaware, but lost one of them. They saw the other, who was carrying a sack, stop running as he approached the service station, turn and walk up to the Monte Carlo. They saw him pause “a minute or two,” and then get into the passenger side of the Monte Carlo. As the Monte Carlo drove off, they saw two men in it.
Officers Steven Rushing and Don LeC-our, Jr., of the McComb Police Department were on patrol and notified of the robbery. They went to Sav-On around 2:00 p.m., and learned from East that he had just been robbed. They followed a blue Buick a short distance onto Interstate 55 (1-55) before seeing that it was a family car and obviously not Reeves’s. They turned, and as they were returning were told on the radio that the suspects were in a white Monte Carlo. They turned into the Delaware exit off the Interstate headed east, and as they did, they observed a white Monte Carlo headed west at the Holiday Inn, driving at a normal rate of speed. They only saw the driver in the car.
Both Rushing and LeCour identified the driver of the Monte Carlo as Gangl. They turned around, and saw the Monte Carlo had an Alabama license tag. They switched on the blue lights and the Monte Carlo sped off. C.V. Glynnis, a Pike County deputy sheriff, was parked at the southbound entrance ramp onto 1-55, and shot at the car. The car got off the road, then back onto the southbound entrance to the Interstate, and sped south. The officers began a high-speed chase in excess of 100 miles per hour. As they would try to pass, Gangl would pull the car over to force them off the highway. Gangl crossed the median and drove the Monte Carlo south in the northbound lane of the Interstate.
In addition to Rushing’s car, Glynnis was also pursuing the Monte Carlo. As the cars approached the Highway 24 exit, the Rushing vehicle crossed the Interstate and took the off ramp from the northbound lane. Glynnis drove off from the westbound ramp, doubled under the bridge and saw the Monte Carlo run into a ditch on the north side of the highway (also Presley Avenue). As he passed the car coming to a stop, Glynnis saw two males, one without a shirt on, run into the woods, one of them running to the north and the other to the east.
The woods were sealed off, and Kenneth Williams, the larger robber was subsequently found and arrested.
About an hour and a half later, Gangl was also seen coming out of some bushes and arrested.
Allen Hawkins was not apprehended that day, but some time thereafter arrested in Birmingham. The Monte Carlo was registered in the names of Allen and Kim Hawkins. The license plate attached to it that day was to a Plymouth vehicle registered in the name of Williams.
LeCour testified that as they were following the Monte Carlo in the high-speed chase down 1-55, it was approximately 2:15 p.m. Rushing testified that when they saw the Monte Carlo on Delaware Avenue it was not over 15 minutes after they had been notified of the robbery, or around 2:21 p.m. Glynnis testified it was about ten or fifteen minutes after he received word of the robbery that he saw the Monte Carlo there at the Delaware Avenue ramp to I-55.
The Monte Carlo was searched, and in it were found a large quantity of drugs spread over the floorboard, a pillowcase full of drugs, a .38 caliber pistol and a bag containing money, and a long-sleeved red pullover shirt with a Harley-Davidson em *339 blem on the front. They also found car keys, and road maps.
Perry Ashley, investigator with the McComb police department, was the officer who searched and inventoried the contents of the Monte Carlo. Ashley also found a paper bag in the alleyway west of Fred’s, which contained $978.00 in cash, a black gun, and some car keys, later identified as being keys to Reeves’s blue Buick. East positively identified many of the drugs found in the car and pillowcase as having come out of his store by the markings on the labels.
Gangl was also from Birmingham. As above noted, the two robbers who entered the store were Williams and Hawkins.
LAW
Precisely as he does now, on his first appeal Gangl argued the sufficiency of the evidence, and following our review of the record, we found this argument without merit. Gangl v. State 539 So.2d 132 (Miss. 1989). Essentially the same evidence was introduced at Gangl’s second trial, and therefore under our previous law the sufficiency of the evidence was settled by Gangl I. See Windham v. State, 602 So.2d 798, 799-200 (Miss.1992) (Prather, J., wherein sufficiency of the evidence rejected on first appeal was again raised on second appeal). If there is any difference between the proof adduced at the first trial and that of the second trial, the majority fails to tell us.[3] Therefore, at least according to Windham, 602 So.2d at 799-800, the issue of the sufficiency of the evidence at the second trial was res judicata.[4]
I could, and perhaps should, rest my case with the well-settled principle of law once again pronounced in our recent Windham. Because we held as a matter of law in Gangl I that there was sufficient evidence to make a jury issue of Gangl’s guilt, how come the same evidence did not make a jury issue in Gangl II? Why has the majority changed the meaning of res judica-ta? I am compelled, however, to analyze the State’s proof in this case on its own merits to demonstrate clearly and beyond peradventure the strong circumstantial case of Gangl’s guilt.
Only in the South could you find a departing robber attempt to ease the worry of a distraught victim by telling her that her expropriated car would be only a short distance away. This also showed a preconceived plan not to use the Buick to flee McComb, but only a sufficient distance to get away from the drug store, and then into another vehicle.
Less than five minutes after the robbery, the Beans saw two men running from the abandoned Buick in Fred’s parking lot. They lost sight of one of them as the two crossed Delaware. The one in sight, no doubt to avoid attracting attention, stopped running and proceeded to walk to the service station. He was carrying a sack of some kind. He walked over to the Monte Carlo, stood there for what they described as a minute or two, looking around. Then he got in the passenger side of the Monte Carlo, and it drove off, the Beans seeing two men in it.
The man who got in the passenger side of the Monte Carlo obviously was one of the men who had been in Sav-On. The driver had to be Gangl, because just a bare few minutes after that he was identified by Rushing and LeCour driving the car on Delaware.
Gangl was driving at a moderate rate of speed, no doubt seeking to avoid raising any suspicion. He may have been cruising in search of the other robber. In any event, the robber in the ear, again no doubt to avoid suspicion, was hunkered down out of sight, because Rushing and LeCour did not see anybody but Gangl in the Monte Carlo.
Gangl, as noted, was driving carefully, cautiously and scrupulously obeying the traffic laws of McComb. But, what did he *340 do when Rushing and LeCour did a U-turn, got in behind the Monte Carlo and turned their blue lights on? He followed the example of the familiar bat and took the law enforcement officers on a chase down 1-55 that will remain silhouetted on the skyline of the memories of the of the good citizens of Pike County.
Following arrest of Williams and Gangl and seizure of the Monte Carlo, there were found in the car a red pullover shirt and what could have been the shirt worn by one of the robbers, all kinds of drugs that came out of Sav-On, a pistol and road maps.
Gangl never set foot in Sav-On Drug Store. We all know that, but we know with equal certainty that he was part and parcel of Hawkins’s and Williams’s attempt to complete their crime by getting out of McComb and Pike County.
The only possible question, and it is very little, is whether Gangl was part of a preconceived plan, did he know about the robbery beforehand, or did he first learn about it after it was all over but the flight? In other words, was Gangl’s first knowledge of the robbery when Williams walked over to the Monte Carlo at the service station and got in the passenger side?
Of course, Gangl did not say he was part of a preconceived plan. He did not tell the officers or circuit court anything. Nor did Williams or Hawkins. Unless one of these gentlemen decides to write his memoirs some day, we will wait until Lamb’s Dream Children are born. We will never know. But, this does not mean that a strong circumstantial evidence case was not made for any sensible man or woman sitting on that jury.
The majority tells us that all that was proved was that Gangl was an accessory after the fact. In deference, I must agree with the learned circuit judge who, when defense counsel suggested such a hypothesis in support of a motion for a directed verdict, responded that one would have to believe in “the tooth fairy” to believe that under the facts of this case Gangl did not know of the proposed robbery beforehand. The circuit judge further suggested it would require an extraordinary degree of naivete to believe Gangl first learned of the robbery after its commission.
Why was Gangl there in the driver’s the get-away car if he did not know the plan beforehand?
All three men were from Alabama, and Gangl just happened to be there by coincidence? Just happened by sitting there in the driver’s seat of Hawkins’ Monte Carlo?
Attributes of circumstantial evidence which any person familiar with life’s experiences recognize are first, that there can be a perfectly innocent explanation for an otherwise highly incriminating event or circumstance which, when given, dissipates our incredulity; and second, the unfortunate person caught in such a predicament is generally not only willing, but eager to give the entire facts. Few of us get through life without at one time or another finding ourselves the recipient of arched-eyebrow scrutiny. But when a person caught in a web of incriminating circumstances is unwilling to offer any explanation, then his behavior becomes indeed suspect. This evaluation of our fellow humans is a law of human behavior, human nature, and no law is going to change it. Courts cannot, nor should they, expect juries of sensible men and women to ignore it.
Every reasonable hypothesis in this ease is consistent with Gangl having been a part of the preconceived plan to rob Sav-On Drugs, his part being to wait on Williams and Hawkins at the car while they robbed, and then assist them in their flight by driving the Monte Carlo.
There is no reasonable hypothesis from this entire factual scenario consistent with Gangl’s having known nothing about the robbery until he saw Williams walk onto the filling station lot that afternoon.
It is the settled law in this State that where there is substantial, reasonable and competent circumstantial evidence supporting the jury’s verdict, it will not be disturbed on appeal. Dixon v. State, 188 Miss. 797, 196 So. 637 (1940). Under this standard, the State in this case went far beyond that required by our law.
*341 This Court stated in Johnson v. State, 23 So.2d 499, 500 (Miss.1945):
It was long ago held by this Court in the case of Browning v. State, 33 Miss. 47, citing Cicely v. State, 13 Smedes & M. 202, 211, and the principle has been uniformly adhered to since that time, that the sufficiency of circumstantial evidence is peculiarly for the determination of the jury, “because it is always solemnly to be weighed and acted upon by their understanding and consciences, and is, from its very nature, the subject of inferences and conclusions in their minds,” and that “a verdict, therefore, found on circumstantial evidence, will always be permitted to stand unless it is opposed by a decided preponderance of the evidence, or is based on no evidence whatsoever.”
Also, Burrill v. State, 328 So.2d 334 (Miss.1976).
Mississippi follows the general law. State v. Donckers, 200 Wash. 45, 93 P.2d 355, 357 (1939):
Whether circumstantial evidence tending to connect appellant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of appellant’s guilty was a question for the jury, and not for the court.
Buenoano v. State, 478 So.2d 387, 390 (Fla.App. 1 Dist.1985):
But the question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, the verdict will not be reversed on appeal.
State v. Allen, 335 So.2d 823, 826 (Fla. 1976):
Circumstantial evidence, by its very nature, is not free from alternate interpretations. The state is not obligated to rebut conclusively every possible variation, however, or to explain every possible construction in a way which is consistent only with the allegations against the defendant. Were those requirements placed on the state for these purposes, circumstantial evidence would always be inadequate to establish a preliminary showing of the necessary elements of a crime.
Also, Whaley v. U.S., 141 F.2d 1010 (5th Cir.1944), cert. den. 323 U.S. 742, 65 S.Ct. 46, 89 L.Ed. 595 (1944); Payne v. State, 424 So.2d 722 (AIa.Cr.App.1982); Coleman v. State, 394 So.2d 82 (Ala.Cr.App.1981); Mauldin v. State 376 So.2d 788 (Ala.Cr.App.1979); People v. Muhly, 15 Cal.App. 416, 114 P. 1017 (1911); Creech v. Commonwealth, 270 Ky. 662, 110 S.W.2d 269 (1937).
[[Image here]]
In Moore v. U.S., 271 F.2d 564, 568 (4th Cir.1959), the Court held:
In a criminal case the accused is protected, at every stage of the trial, with a presumption of innocence and until he is proven guilty beyond a reasonable doubt by proper and competent evidence. No inference of guilt can be drawn from the mere fact that the accused did not testify in his own behalf. These are fundamental principles which require no citation of authority. But other principles have not been overlooked or disregarded in reaching our decision. Circumstantial evidence may support a verdict of guilty, though it does not exclude every reasonable hypothesis consistent with innocence. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. If it be sufficient to support an inference of guilt and the defendant fails to offer a reasonable explanation consistent with innocence, such failure may be considered by the trier of fact. Wilson v. United States, 1896, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Jenkins v. United States, 4 Cir., 1932, 58 F.2d 556. It is not necessary, in appraising the sufficiency of the evidence, that this court be convinced beyond a reasonable doubt of the guilt of the defendant. Bell v. United States, 4 Cir., 1950, 185 F.2d 302. The question is whether the evidence, construed most favorably for the prosecution, is such that a jury (or trial judge) might find the defendant *342 guilty beyond a reasonable doubt, Bell v. United States, supra; United States v. Brown, 2 Cir.1956, 236 F.2d 403; Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391.
The evidence supported the conclusion that Hawkins and Williams did not plan to flee McComb in Reeves’s Buick and that Gangl was the driver of Hawkins’s Monte Carlo, backed into the service station, awaiting one or both of their arrivals, all as part of their plan to rob Sav-On. The jury was further warranted in finding that, pursuant to the plan, Williams did go to the service station, walking so as not to arouse suspicion, and got into the car with part of the loot, and Gangl drove off.
The evidence in this case under settled principles of law supports the verdict of the jury, and I would sustain the State’s petition for rehearing and affirm.
I respectfully dissent.
ROY NOBLE LEE, C.J., and DAN M. LEE, P.J., join this opinion.

. On August 3, 1985, this was a Charter service station, later changed to Exxon.

. This man had also been in the store in the middle of the morning, looked around a few moments, and walked out.

. My review of the record convinces me the State's proof was every bit as strong, if not stronger, in the second trial than the first.

. Yes, this is precisely what we said, twice. Windham, 602 So.2d at 799-800.