[Crim. No. 1250. Second Appellate District, Division Two.—December 7, 1925.]

## THE PEOPLE, Respondent, v. MARVIN STRAUSS et al., Appellants.

[1] CRIMINAL LAW — ROBBERY — EVIDENCE — SUPPORT OF VERDICT.—In this prosecution for robbery, the evidence was sufficient to support the verdicts finding the defendants guilty of robbery in the first degree.

[2] ID.—INSTRUCTIONS—PRINCIPALS—EVIDENCE.—In such prosecution, the jury was properly instructed that all persons concerned in the commission of a felony, whether they directly committed the act constituting the offense or aided and abetted in its commission, though not present, are guilty as principals, and that unless the jury was convinced by the evidence to a moral certainty and beyond a reasonable doubt that the defendants did aid and abet in the commission of the offense, the defendants should be acquitted.

[3] ID.—REASONABLE INFERENCE OF GUILT—INFERENCE OF INNOCENCE—QUESTION FOR JURY—APPEAL.—Where the circumstances are such as to reasonably justify an inference of guilt, the case will not be taken from the jury because an inference of innocence might also have been drawn, but the jury must choose between these two inferences; and it is only where the evidence obviously does not warrant the inference of guilt that the appellate court will interfere.

[4] ID.—ROBBERY—RETURN OF PROPERTY—MITIGATION OF CRIME—EVIDENCE.—The fact that money taken from the victim of a robbery by one of the defendants at the point of a revolver was immediately returned does not relieve the defendants of criminal liability.

[5] ID.—FAILURE OF DEFENDANTS TO TESTIFY—ERRONEOUS INSTRUCTION—ABSENCE OF MISCARRIAGE OF JUSTICE.—Where the defendants did not testify or offer themselves as witnesses, it was technically erroneous for the trial court to instruct the jury that "while a defendant in a criminal action is not required to take the stand and testify, yet if he does, his credibility, and the value and effect of his evidence, are to be weighed and determined by the same rules as the credibility and effect and value of the evidence of any other witness is determined," but where the evidence of defendants' guilt is so convincing that the jury could not reasonably have arrived at any other conclusion, even if the erroneous instruction had not been given, a proper case is presented for the application of section 4½ of article VI of the constitution and no miscarriage of justice can result from affirming the judgments of conviction.

[6] ID.—PREPARATION FOR CRIME—EVIDENCE.—The testimony of an officer that he found a memorandum in the apartment of one of the defendants containing the name and telephone number of

2.   See 22 Cal. Jur. 840.
3.   See 8 Cal. Jur. 588.
4.   See 22 Cal. Jur. 850.

the owner of the automobile used by defendants in the perpetration of the crime was competent and admissible.

[7] Id.—Arrest of Judgment—Appeal.—An order denying a motion in arrest of judgment is not appealable.

---

(1) 17 C. J., p. 223, n. 40; 34 Cyc., p. 1808, n. 78.    (2) 16 C. J., p. 972, n. 75.    (3) 16 C. J., p. 936, n. 75; 17 C. J., p. 256, n. 64. (4) 34 Cyc., p. 1806, n. 59.    (5) 16 C. J., p. 1022, n. 57; 17 C. J., p. 339, n. 64.    (6) 16 C. J., p. 545, n. 87; 34 Cyc., p. 1807, n. 68. (7) 17 C. J., p. 34, n. 49.

APPEAL from judgments of the Superior Court of Los Angeles County and from orders denying motions for new trial. Arthur Keetch, Judge. Affirmed. Orders denying motions in arrest of judgment dismissed.

The facts are stated in the opinion of the court.

Anderson & Anderson and T. E. Parke for Appellants.

Homer C. Mills for Appellant Charles Sciorplate.

U. S. Webb, Attorney-General, and H. H. Linney, Deputy Attorney-General, for Respondent.

CRAIG, J.—The three defendants above named were charged jointly by an information consisting of two counts, in the usual form, with having committed robberies in Los Angeles County. The first count charged that on or about the eleventh day of January, 1925, they robbed one E. E. Foley of a Nash automobile, a diamond ring, and nineteen dollars in money, and the second count alleged that on or about the same date they robbed one Johnny Wilkerson of three dollars in money. At the close of the People's evidence a motion for instructed verdicts of acquittal was made in behalf of appellants, and was overruled. Thereupon two witnesses testified as to the past history and reputation of defendant Strauss for truth, honesty, and integrity, but none of the defendants took the stand. Six separate verdicts were returned by the jury, convicting the respective defendants upon each count of robbery in the

---

7.  See 8 Cal. Jur. 493.

first degree. Motions for new trial were presented in behalf of each defendant, which were denied, and thereafter motions in arrest of judgment were made by appellants, and these motions also were denied. This is an appeal by Strauss and Sciorplate from the rulings of the trial court upon said motions, and from the individual judgments and sentences applicable to each appellant, respectively.

We will first consider the claim that the evidence is insufficient to sustain a conviction upon either count. Regarding the evidence, as a reviewing court must, in the light most favorable to support the verdicts, the facts which will now be detailed we think are quite sufficient.

At about 9 o'clock A. M. on the eleventh day of January, 1925, Foley and Wilkerson drove the former's Nash sedan automobile into a garage near the corner of Moneta Avenue and Forty-fifth Street, in the city of Los Angeles; before they alighted the defendant Russell and a large man whom they could not identify stepped to either side of the car, ordered them out, searched them at the points of revolvers and escaped with Foley's machine; a diamond ring and nineteen dollars in money were taken from Foley, and three dollars was taken from Wilkerson, which, however, was returned; a Buick touring car, with side curtains up, which had been standing on the opposite side of the street, immediately followed the Nash in an easterly direction on Forty-fifth Street, north on Main Street, both cars turning toward the east on Miles Street.

As soon as his car left the garage Foley ran into the street to call an officer, and Wilkerson went through Foley's restaurant to Moneta Avenue. As soon as the Nash turned on to Forty-fifth Street the two machines sped easterly, the Buick keeping within seven to ten feet behind the Nash; Wilkerson testified that Russell drove the Nash away, and that the large man stood on the running-board; that the latter would weigh 175 to 180 pounds; this witness also stated that he had known the defendant Sciorplate for some time as a customer of Foley's. It appears that several persons, including a Mrs. Leonard, summoned the police, and that two motorcycle officers, who were in the immediate vicinity, took up the chase. Officer Hansch testified that a number of people ran across the street, saying that there had been a robbery, and that as he called Policeman Bayer

and started in pursuit of the fleeing machines, some of those in the crowd indicated the Buick, saying, "That is the car!"; that it was running at the rate of about fifty-five miles per hour, and when he sounded his siren it increased its speed, but slackened to turn on to Miles Street, where it stopped. Hansch stated that as he arrived beside the Buick he discovered two men in the car, and that they at once threw up their hands when they saw him. One of the officers related that at this time he said to Strauss, "This is one stickup job you are not going to get away with," to which Strauss made no reply, but sneered, and that Sciorplate, although present, also made no reply.

It is admitted that the two men arrested in the Buick were the appellants, and that Sciorplate is a large man as compared with Strauss or Russell. Foley's Nash was later found, abandoned, some distance from the scene of the arrest. The verdict indicates that the jury were satisfied beyond a reasonable doubt that the defendants were guilty as charged, and we cannot say that the evidence does not justify that belief. Russell undeniably participated in the robbery; a person corresponding to Sciorplate also took part in it; Russell lived at the same place as Burton; Burton owned the Buick car; this car was the one driven by Strauss and Sciorplate; the conduct of these two appellants is sufficient in itself to convict them; it amounts to more than a confession, and it is corroborated by a number of other incriminating circumstances. The jury were justified in believing that at the time of the robbery the Buick was waiting on Forty-fifth Street opposite the garage; its presence and appearance there has no other reasonable explanation; when it arrived is not shown, but it stood in a convenient location for the use to which it appears to have been put, and its shades were drawn—a circumstance no doubt regarded by the jury as unusual and suspicious. A man of Sciorplate's size participated in the robbery; he rode out of the garage on the running-board of the stolen Nash, in the direction of where the Buick was parked, necessarily going in close proximity to the latter, and immediately Sciorplate was with Strauss in the Buick car. This is an inevitable inference from the other circumstances. The last-named car with Strauss driving, as he would naturally

do if he had been waiting for Sciorplate, at once started up and followed the Nash so closely as to suggest extreme hazard considering that both cars were traveling at the rate of fifty-five miles per hour. Bearing in mind that the evidence indicates as clearly as it could without the testimony of any eye-witness to the fact, that Sciorplate had transferred from the Nash to the Buick and that he and Strauss were undoubtedly acting in concert, the credulity of the court is indeed challenged when it is asked to believe that this pursuit was innocent and not intended to assist in the escape of Russell with the Nash car, or when we are asked to say that a jury of reasonable men should have entertained a reasonable doubt that such was the case. It surely was not a mere coincidence that Strauss drove the Buick car at the rate of fifty-five miles an hour, keeping it within seven to ten feet behind the Nash which had just been stolen. The only logical deduction appears to be that these appellants and Russell planned a scheme to evade capture should pursuit of the Nash be made. The system evidently adopted might well have proven successful but for certain circumstances whose happening they failed to foresee. The Buick car was the property of Burton; the appellants' right to its possession could not be questioned, for Burton and Russell lived at the same address and Burton undoubtedly had loaned the car, possibly knowing to what use it was to be put. At any rate, they were secure in the knowledge that he would uphold them in their assertion that their driving this machine was entirely with the consent of the owner. By driving it at an excessive speed they might reasonably expect to attract the attention of pursuers to themselves as the possible robbers, and thus shield the Nash and its driver by distracting attention from the latter. This they did, then, allowing the Nash to round a corner in advance, Strauss stopped, running his car in to the curb; it could fairly be expected that the officers, supposing that they had overtaken the stolen automobile and the robbers, would make no further pursuit or search. Two persons only committed the robbery, and there were two in the Buick when it allowed itself to be overhauled. Russell in the Nash might reasonably have been thought to have thus been given a clear chance to make his getaway. It is probable that

Strauss and Sciorplate, confident that they could not eventually be connected with the robbery, acted with deliberation at this time in giving an appearance of guilt. At any rate, their conduct was most suspicious and damaging to them, as events finally terminated. They at once, and without being asked to do so, put their hands up as a token of surrender and advanced toward the officers. This is not the demeanor of men conscious of having done no wrong; it is not the conduct of men who have merely committed the offense of violating a minor regulation, such, for instance, as a traffic ordinance. But their incriminating conduct was emphasized by their failure to deny the accusation of having committed a felony which was involved in the officer's statement to Strauss, in Sciorplate's presence, that "this is one stickup job you are not going to get away with." And yet, without further connection with the robbery, doubtless appellants would have been liberated. They might well have felt secure when the police learned that the car which had been stolen was not a Buick but a Nash and that Burton, the owner of the Buick, knew of and had consented to Strauss and Sciorplate driving his car; they could be charged with no more serious offense than speeding, and in the meantime Russell would have had ample time to escape with the Nash. But the officers insisted upon knowing more about the men whom they had apprehended. In answer to questions Strauss told where he lived; the officers went there accompanied by Mrs. Strauss, entered the apartment, and found the Los Angeles telephone number of a Mr. Burton, whom they located, and who proved to be the owner of the Buick car; but Strauss had said that Burton was in Kansas City, and that he, Strauss, had borrowed the car there, and had driven it to Los Angeles. An innocent man would have had no occasion to have falsified as to Burton's whereabouts, or in any other manner. However, the reason for this becomes apparent when we consider that Russell, who had the stolen property in his possession, lived at the same place where Burton resided. Of course, Strauss knew that if Burton were located Russell would be almost instantly taken into custody; in conformity with the canny philosophy of Burns, "The best laid plans o' mice and men gang oft agley," their scheme would be punctured and would col-

lapse, and this happened. Bayer and Hansch, the arresting officers, located the address of Burton by the telephone number; went there, and found Russell standing on the front porch, and Foley's diamond ring, and the guns, offered in evidence at the trial, were found in his room. The jury had submitted to its consideration the fact that the appellants, having the Buick car parked with curtains drawn in the immediate vicinity of the robbery, had at once fled, and when given the siren by pursuing officers, had continued their flight; that they had not denied guilt when called upon to do so; that they had so conducted themselves as to be subject to the charge of having intentionally aided in the escape of Russell driving the purloined Nash; that they had falsified in statements to the officers, and were shown to have directly maintained connection with Burton, and indirectly with Russell. [1] These facts are amply sufficient to sustain the verdicts; and there are others which might be pointed out of lesser import, but nevertheless adding certainty, almost to the point of demonstration, to the conclusion already fairly reached.

[2] The jury were properly instructed that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are guilty as principals; and that unless they were convinced by the evidence before them to a moral certainty and beyond a reasonable doubt that the appellants did aid and abet in the commission of the offense, they should acquit them. The evidence upon which the verdicts in question were based is largely circumstantial, but as was said in *People* v. *Muhly,* 15 Cal. App. 416 [114 Pac. 1017]:

"It rarely happens that circumstances attending the commission of a crime may not, in the opinion of the reviewing court, reasonably be susceptible of an interpretation compatible with the innocence of the person associated with such circumstances; and if one after another of the alleged incriminating circumstances may be eliminated, they would necessarily cease to have any probative force considered collectively.

" . . . As we understand the Staples case, 149 Cal. 405, 425 [86 Pac. 886], the rule there laid down followed an

analysis of the evidence from which the court was authorized to conclude that there was no evidence warranting the verdict.   We do not understand that case to hold that where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn.   Between these two inferences the jury must choose, and it is only where the evidence obviously does not warrant the inference of guilt that the court will interfere.''

[3]   It was also held in *People* v. *Martinez,* 20 Cal. App. 343 [128 Pac. 952], that where the circumstances are such as to reasonably justify the inference of guilt, as found by the jury, the fact that an inference of innocence might likewise be reasonably drawn therefrom, does not present a question of law for review by an appellate court, any more than does a verdict based upon direct conflicting evidence; that in neither case will the verdict be disturbed.

[4]   It is further insisted that Wilkerson, having immediately regained possession of the money taken from him by Russell, was not robbed, and that therefore a conviction upon the second count of the information was unauthorized.   He was ordered out of the automobile, held up at the point of a revolver, and his money taken from him, as alleged, by force, and against his will.   Had Russell kept the three dollars, there would have been no dispute upon this point, but it is urged that the robber returned the money to his victim, and that therefore he committed no offense.   Russell's generosity seems to have been smitten only by the small amount and Wilkerson's remark that it was all the money that he had, but the appellants seek to mitigate the offense upon the fact of recovery, rather than to explain their counsel and support of one who went prepared to kill had the amount been larger and its theft been met with resistance.

The question presented has heretofore been considered and decided in this state.   In *People* v. *Anderson,* 59 Cal. App. 408 [211 Pac. 254], the defendants were charged with having robbed another of a bill of sale to an automobile, a gold watch, money, and other property; Anderson compelled the victim to assign the bill of sale to his machine to the robber, but returned it to him.   It was there said: ''Nor

does the fact that the defendants returned the property to Litts of itself relieve their act in taking it of stigma of criminality. It was for the jury to consider that circumstance with other circumstances in the case in determining the question of guilt or innocence."

In *McGinty* v. *State*, 97 Ga. 368 [23 S. E. 831], it was held that "Where the offense of robbery is once actually completed, by the felonious and violent taking of property from the person of another into the possession of the thief, it cannot be purged by any subsequent redelivery of the property to the owner; and this is true although the thief may have retained possession but a short length of time. 2 Bish. New Cr. Law, sec. 1161, 2 Russ. Crimes, 104, and cases cited." The evidence was therefore clearly sufficient to establish the crime charged in the second count, and the return of the money did not have the effect of relieving the defendants of criminal liability.

None of the defendants took the stand, but the trial court gave the following instruction, which appellants contend was reversible error: "You are instructed that while the defendant in a criminal action is not required to take the stand and testify, yet if he does so, his credibility, and the value and effect of his evidence are to be weighed and determined by the same rules as the credibility and effect and value of the evidence of any other witness is determined."

It is contended that the court thus, in effect, singled out the defendants for special comment upon a matter which was nonexistent, and yet must have conveyed to the jury the impression that, by failing to take the witness-stand they were not willing to subject themselves to the same rules as those governing the credibility and effect and value of the evidence of any other witness. A general instruction also was given, wherein the jury were told that they were the exclusive judges of the credibility of witnesses, and that the character of witnesses should be taken into consideration in determining their credibility and the facts, as to whether or not they had spoken the truth; that a witness is presumed to speak the truth, but that such presumption may be repelled by the manner in which he testified, his interest in the case, if any, or by evidence affecting his character for truth, honesty, and integrity, or by contradictory evi-

dence. It is argued that coupling the two instructions results in charging matters which have been criticised upon appeal even where a defendant testified. *People* v. *Maughs*, 149 Cal. 253 [86 Pac. 187], is quoted as supporting this contention. There the defendant took the witness-stand and an instruction was given, expressly stating to the jury that "Where the defendant offers himself as a witness, in determining his credibility, it is proper to take into consideration the consequences, inducements, and temptations which would ordinarily influence a person in his situation." In other words, it was indicated that the defendant's interest in the case might be expected to cast doubt upon the credibility of his testimony. The supreme court said that it had previously been told "that it is difficult, logically, to attribute the giving of such an instruction to anything other than a purpose to expressly disparage the defendant, 'the very thing that a court has no authority to do, in view of our constitutional provision.'" *People* v. *Emmons*, 13 Cal. App. 487 [110 Pac. 151], is also relied upon. There, the defendant did not take the stand, but the jury were instructed that if the defendant offered himself as a witness he might be cross-examined by counsel for the People as to all matters about which he was examined in chief. It was said that since it was not a question for the jury as to what could be done had the defendant taken the stand, there appeared to be no conceivable occasion which could arise during a criminal trial for giving an instruction upon this point. Since the defendant in that case did not testify, it was held that the instruction could only be regarded as a suggestion that the only probable reason he did not do so was because, in that event, he might have been cross-examined. It will be observed that the court further instructed the jury that the defendant's "neglect or refusal to be a witness cannot in any manner prejudice him or be used against him on the trial or proceeding." The reasoning of the opinions in these cases hardly applies with equal force to the instruction before us, and yet we have no doubt that under the circumstances here involved its giving was technically an error. The defendant had not offered himself as a witness, and did not testify; there was no occasion or justification for any instruction upon that point unless, if

requested, to have informed the jury that the defendant is not required to testify and that his failure to do so must not prejudice him in any way. To go further and add comment upon any consequences which might follow had the defendant chosen to become a witness is to create in the minds of the jury at least a question as to whether or not his not having testified might be attributed to a desire upon his part to avoid such consequences—that is, not to have his evidence weighed and determined by the same rules as that of other witnesses.

[5] However, we consider this a proper case for the application of section 4½ of article VI of the constitution of this state. The evidence of the defendants' guilt is so convincing that we do not think the jury could reasonably have arrived at any other conclusion, even if the erroneous instruction mentioned had not been given. A careful reading of the entire record satisfies us that no miscarriage of justice can result from affirming the judgments from which appeals are here taken.

[6] One other point remains to be considered. It appears that the officer, Brown, was permitted to testify that at Strauss' apartment he found written on a piece of paper the following memoranda: "Mr. Burton, Atlantic 6206." He also stated that he called "information," and that "that telephone was registered to M. C. Jackson, 319 East 16th street." Before this testimony was given appellants' counsel objected on the grounds that it was irrelevant, incompetent, and immaterial. After a part of the answer had been given, the same objection was repeated, with the additional ground stated that the answer was not responsive to the question. The first statement made by the officer, that he had found a piece of paper lying on top of the telephone, bearing the writing "Mr. Burton, Atlantic 6206," was clearly admissible; it may be that the rest of the statement made by him should have been excluded as hearsay, but no objection was made upon that ground. All of this evidence was competent, relevant, and very material. This is apparent from our discussion of the evidence bearing upon a point previously considered. It is noteworthy also that the judge, in overruling the objections, remarked that he did not know at that time whether or not the testimony would

be admissible, but that it could be stricken out in case it should be found to be objectionable. No motion to strike was made.

[7] The appeals from orders denying the motions in arrest of judgment are dismissed, since such orders are not appealable. (*People* v. *Peery,* 26 Cal. App. 143 [146 Pac. 44]; *People* v. *Mooney,* 132 Cal. 13 [63 Pac. 1070]; *People* v. *Matuszewski,* 138 Cal. 533 [71 Pac. 701]; *People* v. *Feld,* 149 Cal. 464 [86 Pac. 1100].) The orders denying appellants' motions for new trial are affirmed and the judgments are affirmed.

Finlayson, P. J., and Works, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 6, 1926, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 4, 1926.