[Crim. No. 987. Third Appellate District.—October 17, 1927.]

THE PEOPLE, Respondent, v. FRANK E. PAGE, Appellant.

D. B. Robnett and A. K. Wylie for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Oscar Gibbons for Respondent.

FINCH, P. J.—The defendant was convicted of the crime of murder of the second degree. This appeal is from the judgment of conviction and the order denying a new trial.

For more than a year prior to the homicide the defendant and Mrs. Pearl Connell, who was of the age of about forty years, jointly conducted a hotel at Cedarville, Modoc County. Apparently he was a widower and she a widow. Mrs. Connell disappeared during the evening of July 6, 1926, and two days later her body was found in an old cellar in the town. This cellar was a mere excavation, partly covered with a board roof and without any wall at one end thereof, that end being entirely open. An autopsy showed that she had been severely beaten about the head and face and that her death was caused by strangulation, her windpipe being crushed, evidently by the grip of some person's fingers on her throat and neck.

The evidence tending to connect the defendant with the commission of the crime is entirely circumstantial. There is

substantial evidence that he desired to purchase Mrs. Connell's interest in the business, but was unable to raise sufficient money to do so; that the parties engaged in frequent bitter quarrels; that in May or June, 1926, "he said they had just had a hell of a row, and he said that Francis (his adopted son, of the age of fifteen or sixteen years) had knocked her down with a cup, and he (defendant) laughed about it"; that about two weeks before her death he said "she just gave me hell and I can't stand it any longer"; that he frequently said "he was going to get rid of her because she was a detriment to the public and a nuisance around the hotel"; that in June, 1926, he said: "Pearl and I just had it upstairs; I grabbed her by the nape of the neck and pushed her up against the wall and I just took my fist and popped her one. . . . I showed her where she belongs"; that during that month he told her she was a "low-down dirty cur," and applied other and viler terms to her; that in March or April of that year he "packed Mrs. Connell out of the house and told her to stay out of there"; that in February, 1926, he said: "I have got to get rid of her. . . . I don't know how I am going to do it, but . . . it is going to be done"; that at that time one of the witnesses, to whom the defendant had related his troubles, said to him, "Pearl is jealous, you make her jealous," to which he replied, "Yes, and I will make her a damn sight more so, too."

About five years prior to the homicide, a young woman, who will be called May, her given name, resided in Cedarville for two or three months and during that time she and the defendant became "pretty good friends," after which time they met but once prior to the day of the homicide, and then only for a few minutes. May was married to a man in a Sacramento valley town May 22, 1926, and thereafter resided in that town. With one of her brothers and another man she went by automobile from her home to Alturas, where they all attended a rodeo from the 2d to the 5th of July. Apparently their supply of money was running low, and they decided to go to Cedarville. The woman at whose place May stayed while in Alturas testified that May "was talking about going over there (to Cedarville), . . . and they thought they would go to the Frank Beebe house. May says, 'Well, if we go there and

it don't suit us, we will go to the hotel. I might be in there in a couple of weeks. . . . I got his money once and I can get it again.' . . . They got ready to go . . . and I says, 'Well, are you coming back, or when will I look for you, or what are you going to do?' and May says, 'Well, you know what we are going for?' " May and her companions drove to Cedarville July 6th, arriving there about 4 o'clock in the afternoon, and went to the "old Beebe house," but, finding no water in the well there, they finally went to an unoccupied house, known as the Mabrier house, and "camped in that house," they having a light camping outfit with them. May and her brother went to the store to buy some provisions and on the trip she met Nick Tisserand, whom she had known for many years. She testified: "I asked him where Frank Page was. . . . He said he was in the hotel. . . . I told him if he saw him to tell him to come up to the Mabrier place, that I wanted to see him. . . . Between 7:30 and 8 o'clock . . . he (defendant) drove up and honked the horn, and I went out. . . . We went down on the Eagleville road and turned around near the Dyke place. . . . We pulled off the road and stopped for a few minutes, and then we came back to the Mabrier house. . . . We stayed there a little while and then drove to the mouth of the canyon and then came back to the Mabrier house." She further testified that, after the ride, the defendant left the Mabrier house about 9 o'clock, that she thought it was not later than 9 o'clock. May was interrogated by the district attorney on the 8th of July, after the body was found. Relative to the time at which she and the defendant returned to the Mabrier house, she then said: "I judge it was right around ten o'clock or maybe later when we got back. . . . We sat there for a while, . . . maybe an hour or so, I don't know." At the trial she testified that the statement last quoted is false and that she made it for the purpose of "trying to help Frank"; that "I just figured it this way; if Frank did it, he did it immediately after he left me, and I wanted to help him if I could, and I was not looking for any notoriety myself." The defendant testified that after leaving May at the Mabrier house, on their return from the ride mentioned, he drove directly to the hotel, arriving there after 10 o'clock. Other witnesses testified that he arrived there about 10 o'clock or later. It

requires but a few minutes' time to drive from the one place to the other. May and the defendant are the only witnesses who testified as to the time at which the defendant left the Mabrier house.

Relative to the movements of Mrs. Connell during the evening of July 6th, a guest at the hotel testified: "I saw her when she went out of the hotel. . . . I think it was about a quarter to nine that evening; it was after half-past eight. It was between half-past eight and nine o'clock. . . . She asked me where Frank was. . . . I told her maybe he had went to see May. . . . I told her that Nick Tisserand had told me that he had brought Frank Page word from May—that if he wanted to see her he would find her at the Mabrier house. . . . She (Mrs. Connell) seemed to act quite mad and got wild looking. . . . She went to the safe and looked around the safe and the shelf behind the counter. . . . She pulled out a drawer and there was something knocking against the end of the drawer." The next morning the defendant said that "the gun was missing that was in there," that "it did not make much difference anyway, as there was no loads in the gun."

Several witnesses testified that they heard the screams of a woman during the evening of July 6th between 9 and 10 o'clock. The witnesses who gave the most plausible reasons for the accuracy of their statements fixed the time between 9:15 and 9:30. One woman testified that she heard "one big and two little screams." Another woman testified that she heard a man's voice say, "God damn you," and "then a scream, and then another scream and then a kind of a — I don't know what kind of a noise." In the street, a short distance from where the body was found, "the weeds had been mashed down and it looked like the appearance of a struggle having taken place there." Mrs. Connell's shoes were found at that place.

A woman employed in the hotel testified that the defendant was up at an unusually early hour in the morning of July 7th; that at that time he said that the door of Mrs. Connell's room was open and that she was not in the room, that he had gone to Eagleville the evening before to see a man who "wanted to go out and look at some mine" and that he reached the hotel on his return about 9 o'clock; that between 9 and 10 o'clock in the forenoon of the same

day "he came into the kitchen and said, 'I did not get home last night until eleven o'clock, because I was out with that damned ——, May ——, and I did not want anyone to know it' ''; that shortly after the body was found the witness said to the defendant, "Frank Page, you killed that woman as sure as there is a God in heaven," to which he made no reply, but "turned around and walked out." This witness identified a rubber inner sole of a shoe, hereinafter referred to, as one that she had seen during June, 1926, behind the hotel counter. A witness who heard the woman's screams testified that, between 7:30 and 8 o'clock in the morning of July 7th, the defendant called at the home of the witness and stated that Mrs. Connell left "yesterday afternoon," and that on leaving he said, "Don't say anything about Pearl being gone."

A pair of shoes and a pair of socks, both admittedly worn by defendant during the evening of July 6th, were introduced in evidence. Also, the rubber inner sole referred to was admitted in evidence. The defendant testified that he never saw the inner sole until it was produced at the trial. A witness, who was district attorney at the time of the homicide, testified that he picked up this inner sole at the time the body was found and about ten feet from the old cellar.

Edward Oscar Heinrich, a consulting criminologist employed by the district attorney, testified that, from "two abrasions of the composition of the rubber" inner sole "which correspond in their position with two nails in the heel" of the left shoe, it was his opinion that "the marks on the inner sole might have been made by the nails of that shoe." On cross-examination by counsel for defendant, the witness was asked, "Will you state to the jury as a fact, beyond all reasonable doubt, that those imprints in that inner sole were made by the tacks in that left shoe which is in evidence here?" The witness answered, "Yes, sir." The witness also testified that the soil on the defendant's socks is "very similar to "the soil at and around" the old cellar.

Chauncey McGovern, a consulting criminologist employed by the defendant, testified with equal positiveness that Heinrich's opinions are entirely erroneous, saying, "It is my definite positive opinion that it (the inner sole) was never

used in that shoe, and was never made for that shoe, but was made for a shoe that was at least three sizes smaller."

Both criminologists produced powerful microscopes for the use of the jurors in their inspection of the exhibits. It is not improbable that the jurors were influenced more by their own examinations of such exhibits than by the opinions of the experts.

The defendant testified that the shoes in question were formerly owned by a guest at the hotel, who died in January or February, 1926; that "when his sister came, I offered her the shoes, and all his shoes, . . . but she said she did not want them. Then I picked out these shoes and commenced wearing them. . . . I saw they were a good pair of shoes, and I kept them and wore them; they was good for me when I did not have any."

The defendant was put to the necessity of squarely contradicting a large number of witnesses, and thirteen citizens of Cedarville testified that his reputation for truth, honesty, and integrity was bad.

It cannot be held, as a matter of law, that the evidence is insufficient to warrant the verdict. There is substantial evidence to justify the inference that the defendant greatly desired to be rid of the deceased; that he was financially unable to purchase her interest in the business; that he had frequently quarreled with her and had, on at least two occasions, resorted to physical violence; that she was jealous of him; that about 9 o'clock in the evening she took a gun and left the hotel when informed that the defendant had gone to see May; that about a half hour later, in a struggle with some man, she received violent blows upon her head and face and was then strangled; that the defendant's movements from 9 to 10 o'clock are accounted for only by his own testimony, which is squarely contradicted by that of May; that the defendant at first gave a false account of his whereabouts during the evening of the homicide; that he at first made a false statement as to the time of his return to the hotel that evening and, a few hours later, when he probably perceived that the truth would serve his purpose better, he correctly stated the time of such return; and that he remained silent when directly accused of the murder by a woman in his employ. Neither can it be said that the presence of the inner sole near

the place where the body was found and the character of the soil adhering to defendant's socks are not material circumstances entitled to some weight in the chain of circumstantial evidence. Shoes often leave tell-tale tracks which could have been avoided by their removal.

Considering all the circumstances enumerated, including defendant's attitude toward the deceased and the latter's evident agitation at the time she left the hotel, the jury may have reasonably inferred that she left the hotel and the defendant the Mabrier house about the same time; that they met in the street opposite the old cellar and there engaged in an altercation; that in the altercation the defendant violently assaulted the deceased with his fists and that, for the purpose of stifling her screams, he then seized her by the throat and choked her, thereby causing her death. Whether or not the deceased met her death in the manner stated, the circumstances thereof are such that the defendant's guilt or innocence was a question of fact for the jury.

Appellant contends that such circumstances are equally consistent with the hypothesis of defendant's innocence as that of his guilt and that, therefore, "there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court," citing *People* v. *Staples,* 149 Cal. 405, 425 [86 Pac. 886, 894], where it is said: "The deduction to be drawn from these circumstances is ordinarily one for the jury, but where . . . every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court."

It is not to be presumed that it was intended, by the language quoted, to declare that an appellate court may substitute its judgment for that of the jury in determining whether the circumstances relied on to establish a defendant's guilt are equally consistent with his innocence. In the language of this court in *People* v. *Muhly,* 15 Cal. App. 416, 419 [114 Pac. 1017, 1018], "We do not understand that case to hold that where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn. Between these two inferences the jury must choose, and it is only where the evidence

obviously does not warrant the inference of guilt that the court will interfere.'' This language was quoted with approval in *People* v. *Martinez*, 20 Cal. App. 343, 345 [128 Pac. 952], and *People* v. *Strauss*, 75 Cal. App. 447, 455 [243 Pac. 67]. In the latter case a hearing in the supreme court was denied.

Heinrich testified that he had examined the soil in the vicinity of the old cellar and that it is similar to that found on defendant's socks. This examination, apparently, was made without the use of a microscope. He also testified that he made a miscroscopic examination of samples of soil furnished by the sheriff, presumably from the cellar, but that he did not know that they were taken from the cellar. Counsel for defendant then moved the court to strike out the testimony of the witness ''in regard to the soil on the socks being similar to the soil in the cellar, on the ground that it is not shown that this soil that was brought to him came from the cellar.'' The court said: ''I will allow it to stand subject to your motion in the event it is not connected up.'' It is now contended that it was not connected up and that the court erred in not striking out the evidence. There are two answers to the contention. First, the witness had testified that he had examined the soil around the cellar without the aid of a microscope. This was a sufficient foundation for the admission in evidence of his opinion. Secondly, the defendant waived his objection by not renewing his motion after failure of the prosecution to prove that the samples of soil furnished by the sheriff came from the cellar. (24 Cal. Jur. 782; *Estate of Wempe*, 185 Cal. 557, 564 [197 Pac. 949].)

 It is urged that the court erred in permitting Heinrich ''to give his opinion and conclusion with regard to what made the holes in the rubber inner sole; and to testify as to his reasons for such opinion.'' The question to which objection was made at the trial was whether the marks on the inner sole ''might have been made by the nails of that shoe.'' The witness had testified that he had made accurate measurements of the distance between the imprints in the rubber inner sole while under a pressure of 150 pounds and of that between the nails in the shoe and had found them the same, and his answer that the imprints might have been made by such nails was an obvious conclusion from the facts

stated, a conclusion which the jurors themselves doubtless reached if they believed such facts. If, therefore, it be conceded that the matter was not a proper subject of expert testimony, the error complained of was not prejudicial.

The court refused to instruct the jury that the absence of motive "is a circumstance in favor of the innocence of the defendant." Such refusal was not error. (*People* v. *Wilkins,* 158 Cal. 530, 536 [111 Pac. 612].) The court properly refused to instruct "that any evidence that has been introduced in this case, showing the conduct or relation of the defendant with the said deceased Pearl Connell, can only be considered by you in determining whether or not the defendant might or might not have had a motive to commit the crime charged against him." Obviously such evidence was relevant to show malice.

From affidavits presented on the hearing of defendant's motion for a new trial, it appears that the case was submitted to the jury about noon, May 12, 1927; that the jury returned a verdict about 4 o'clock in the afternoon of the following day; that one of the jurors was suffering from an infected tooth, which was being treated by a dentist; that it was necessary for the dentist to clean and repack the tooth after each meal; that after the evening meal of May 12th and the morning and noon meals of the next day the sheriff or his deputy took such juror to the dentist for treatment, remaining in the dentist's office with the juror about fifteen minutes on each occasion; that during all of the times that he was absent from the jury-room the juror was in the immediate presence and custody of the officer, and that no reference was made to the case during any of said times, except that on one occasion the dentist asked the deputy sheriff in charge of the juror when the jury would be through, to which the deputy replied that he did not know; and that "no discussion was had upon any phase of said cause and no vote thereon was taken" at any time during which such juror was absent from the jury-room. "Where the jury has been permitted to separate while deliberating upon a verdict, under such circumstances as to make it appear that they might have been tampered with, a new trial should be granted, unless there is affirmative proof upon behalf of the People explaining the separation and showing that the defendant was not prejudiced thereby.

. . . If this burden is met by the People a new trial should be denied." (*People* v. *Cord,* 157 Cal. 562, 571 [108 Pac. 511, 515].) The proof in this case is ample to show that the defendant was not prejudiced by the separation of the jury.

■ The defendant was sentenced to "imprisonment in the state prison of the State of California, at San Quentin." Appellant contends that the judgment is void. It is in the form approved in *People* v. *Ure,* 68 Cal. App. 545, 548, [229 Pac. 987], except that in that case the judgment contained the additional words "as prescribed by law." Section 1168 of the Penal Code provides that "the court in imposing . . . sentence shall not fix the term or duration of the period of imprisonment." In *People* v. *Mendosa,* 178 Cal. 509, 510 [173 Pac. 998], it is said: "Under this section the judgment of the court properly consists of a recital of the offense of which the defendant stands convicted, a designation of the state prison to which he is committed, and nothing more." Measured by this rule, the judgment is valid.

The judgment and the order are affirmed.

Burroughs, J., *pro tem.,* and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 15, 1927.

Preston, J., dissented.