[Crim. No. 3714. In Bank.—March 26, 1935.]

THE PEOPLE, Respondent, v. ELLIS J. LATONA, Appellant.

Kirtland I. Perky, Ralph W. Eckhardt and James E. Fenton for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendant was convicted in the Superior Court of Los Angeles County of the murder of Jose S. Flores, a paroled prisoner of the Arizona Penitentiary at Florence. The jury's verdict was without recommendation. This is an appeal from the judgment pronounced thereon and from the order denying defendant's motion for a new trial. The evidence connecting the defendant with the murder is entirely circumstantial. The body of Flores was found in the latter part of May, 1933, lying in the brush in Mint canyon leading into Antelope valley and the Mojave desert, and about three hundred yards north of Davenport road. The body bore two shot-

gun wounds of the head and neck, inflicted with evident intent to destroy the face beyond recognition, and a shotgun wound of the right wrist. Blood had coagulated on the ground underneath the head of deceased. No shotgun was found, but two shotgun shells were discovered near the body. Upon the body were found certain articles such as handkerchief, comb, razor blade, matches, sixty-one cents in change, parole papers, addressed envelopes for reporting to the warden of the Florence Penitentiary, and in the left breast pocket of the shirt a card case containing an identification card with the following writing on it: "My name is Manuel Villa. I live at 804 Yale street. In case of accident, notify Ellis J. Latona, who lives at 1179 Isabel street." Villa, a Mexican, and Latona, an Italian, were married to sisters, but the families were not on social terms, although Villa and Latona remained friendly, and knowledge of the relationship seems to have been confined to the immediate families. Neither admitted having known Flores. Villa's wife was in the State Hospital at Patton. Villa had been out of employment and was upon the county relief roll. The appellant had been employed by the Los Angeles Railway Company, and his employment had terminated in September, 1932, with an accident for which he had received workmen's compensation, and he had been out of work for several months. A judgment for $2,000 had also been obtained against him. Some time in March or April, 1933, the appellant called on Villa at his rooming house, 804 Yale Street, and stated to Villa that he had an opportunity for employment by an insurance company at a salary, if he could obtain ten or twelve applications for insurance, and asked Villa if he would not help him by taking out an insurance policy. This promise of employment it was testified was never made to appellant by anyone connected with the insurance association. Villa stated that he had no money with which to pay the necessary premiums or initial six months membership fee, which Latona agreed to pay.

However, it appeared in evidence that about two years before, the appellant had been called upon, as an insurance prospect, by a Mr. William J. Miller, who represented the Policy Holders Life Insurance Association, a mutual assessment association, which relied upon the truthfulness of the answers to its questionnaire and required no medical or

physical examination. The nature of the life insurance, its cost, and so forth, were explained to appellant. At that time appellant explained that he was receiving workmen's compensation and that his physical condition as a result of his accident was such that he could not take out life insurance although he would like to. In the early part of April, 1933, Miller again called upon appellant to see if he was interested in life insurance at that time. About the 10th of April the appellant went to Mr. Miller's home and stated that he was unable himself to take out any insurance, but he believed he could secure some insurance on the lives of his father-in-law and mother-in-law; that they were not in town at all times, and if given some application blanks he would have them filled out and return them to Mr. Miller. Appellant was given several application blanks.

In order to help the appellant secure applications Villa finally agreed to make application for insurance and filled out two applications, telling appellant to make his wife beneficiary. The signatures, however, were printed in pencil and the applications were rejected because not written out and were subsequently destroyed by Mr. Miller after he had transferred the essential data to new applications which Miller gave to appellant to secure Villa's signature, together with a stamped, self-addressed envelope to be mailed direct to the company's office. Two applications apparently signed by Villa for $1500 insurance each and naming the appellant as beneficiary were returned by the appellant to Mr. Miller and insurance policies were issued thereon and on the 19th or 20th of April, 1933, these policies were given to appellant for delivery to Villa, each naming Ellis J. Latona as beneficiary. The appellant stated to Miller that Villa was a man hard to get in touch with; was away from home a good deal, and that if notices were sent to Villa they might not reach him and the policies might thereby lapse, and that in order that this might not happen all communications and notices in regard thereto were to be sent to the appellant at his address, 1179 Isabel Street, Los Angeles.

It also appeared that Villa had a stepson, Joseph Ladato, fourteen years of age, who lived with his grandparents at 658 LaMar Street, Los Angeles. April 24, 1933, was Ladato's birthday, and appellant, who is his uncle, called at Ladato's home and took him to school in his automobile,

a blue Essex sedan. The story told Villa about a promise of position if appellant secured twelve or fourteen applications for life insurance was repeated to Ladato and he was induced · to sign an application for insurance, in which Josephine Latona, appellant's wife, was named as beneficiary. Secrecy was enjoined upon the boy. Ladato never received the policy. The insurance company received no compensation, for it seems that appellant was to receive a courtesy policy for securing the Villa insurance and a promise to put Miller in touch with further life insurance business, and the Ladato application was substituted for the courtesy policy that appellant was to receive, on his own life.

Shortly thereafter Manuel Villa went to Globe, Arizona, the home of his parents, and remained there until returned to Los Angeles by the officers in connection with this case. In the meantime the appellant had placed a "missing report" as to Villa with the Los Angeles police, who located Villa at Globe, Arizona.

Villa testified that he did print and sign his name at the top and bottom of the two original applications which were rejected, and thereafter destroyed by Miller; that he had never seen appellant or heard from him after leaving Los Angeles, and that he did not sign any further or additional applications for insurance of any kind; that he never received any policies or communications pertaining to such insurance; that he had never seen the identification card or card case found on the body of Flores, and that the handwriting was not his.

The body of Flores was discovered by a young man who reported it to Mr. Hammack, an employee of the Olsen ranch, located about two-fifths of a mile away. The sheriff's office was notified and Deputy Sheriffs Brewster and Morrell examined the body and removed from the clothing the minor articles already mentioned. Mr. Hammack told Officer Morrell that while pasturing cattle the day previous he had seen an Essex sedan in the vicinity of where the body was found about 10:20 o'clock in the morning, and that while circling a knoll about 150 feet away from the automobile he heard two shots about two seconds apart which sounded like blasts from a shotgun but paid no attention to them as there are many hunters out that way. Again, when about 200 feet

from the Olsen house he saw this same Essex sedan moving in an easterly direction on the Davenport road, a darkish blue car, with black top, and a metal trunk in the rear. Mr. Bevins, a school bus driver for the Agua Dulce school, who lives on the Mint canyon highway about three miles from the intersection of Davenport road, between 6 and 7:15 o'clock of a morning within two or three days of the finding of the body, saw a blue Essex sedan, of about a 1927 model, with a metal trunk in the rear, and a man at the wheel, going unusually slow on Mint canyon highway in front of his home. Bevins noticed a gold star on the right-hand side of the windshield. While returning home after delivering his load of school children he again saw the same automobile parked a little off the highway and again noticed the brown or gold star on the windshield and noticed that it was a little ragged on a couple of its corners. He was also able to notice the color of the top of the Essex sedan, which was black. It should be added that the tire prints where the Essex was parked at the time of the tragedy were the size of the Essex subsequently found to belong to appellant and were without tread marks, the tread of the tires on appellant's car having been worn off.

After finding the body Officers Morrell and Sepulveda went to appellant's home at 1179 Isabel Street and told the appellant of the finding of the body in Mint canyon and that an identification card which read "Manuel Villa" and his address 804 Yale Street, and to notify "Ellis J. Latona" had been found thereon, but that they were doubtful if the body was that of Manuel Villa because they had also found parole papers with the name "Jose Flores" and they would like to have appellant come and identify the body as that of Manuel Villa. The officers also stated to appellant that they were looking for a blue Essex sedan and asked appellant if he owned a car. Appellant stated that his car was standing out in front, a Star automobile and that it had not been in use for some time. The officers discovered that the radiator of the machine was hot, and appellant's son-in-law volunteered that he had just used it. The appellant made no mention of owning a blue Essex sedan. Such a car with ragged gold or brown star on the windshield, and a metal trunk, as described by the witnesses Hammack and Bevins as having been seen in the neighborhood about the time of

the finding of the body of Flores was thereafter found in the possession of the appellant. The windshield with the ragged gold star thereon was admitted in evidence. Subsequently, also, the appellant, when being questioned by the officers, denied any knowledge of the insurance applications, even when confronted by Manuel Villa.

Flores was last seen alive about May 20th, when he was, with a group of other convicts, turned adrift near the California line by the warden of the penitentiary at Florence, Arizona.

■ Appellant's main ground of appeal is that the evidence is legally insufficient to show participation of the appellant in the killing of Flores, or that he aided or abetted such killing.

As before stated, the evidence as to appellant's participation in the crime is wholly circumstantial. Guilty connection with the commission of a crime may be established by circumstantial evidence (*State* v. *Cristani,* 192 Iowa, 615 [185 N. W. 111] ; *People* v. *Kneiling,* 127 Cal. App. 151 [15 Pac. (2d) 561] ), and the jury had before it many circumstances from which they could draw proper legal inferences of guilt. They had the fact that the appellant made statements inconsistent with the truth when first questioned by the officers; that when told by the officers that they were looking for a blue Essex sedan he gave no information or intimation that he owned such a car, although such a car was then in his garage, corresponding in description to the Essex sedan described by the witnesses Hammack and Bevins as having been seen by them in the vicinity of where the body of Flores was found about the time of his killing. The jury had the positive evidence of Villa that he did not sign the applications for insurance upon which the policies of insurance were issued in favor of appellant and given to him for delivery to Villa; that Villa had never seen the identification card bearing his name and address and the leather case in which it was contained, and to notify Ellis J. Latona at 1179 Isabel Street, nor had he ever signed such a card. There was the further evidence that the signature of "Manuel Villa" was a simulated one which was probably written with the left hand and that appellant refused to make any effort to write with his left hand when requested to do so by the officers.

Appellant contends that there is here presented an extreme case of inferences based upon inferences upon which to base a conviction, and not a case of a principal circumstance or inference from which to infer guilt to a moral certainty, and that taking the framework of "moral certainty" the jury was required to consider elements of time, place, motive, means, opportunity and conduct, which appellant insists the jury did not do. However, as was said in *People* v. *Martinez*, 20 Cal. App. 343, 345 [128 Pac. 952], if "the circumstances reasonably justified the conclusion of the jury as expressed in their verdict, and even though this court were of the opinion that such circumstances might be reasonably reconciled with the innocence of defendant, such fact does not warrant interference with the determination of the jury". The case just cited has been approved in the following authorities: *People* v. *Strauss*, 75 Cal. App. 447–455 [243 Pac. 67]; *People* v. *Medalgi*, 94 Cal. App. 543–545 [271 Pac. 552]; *People* v. *Mitsunaga*, 91 Cal. App. 298, [266 Pac. 1020]; *People* v. *Page*, 86 Cal. App. 148–156 [260 Pac. 591]; *People* v. *Hector*, 96 Cal. App. 102–106 [273 Pac. 843]; *People* v. *Frahm*, 107 Cal. App. 253–266 [290 Pac. 678].

The fact that Flores was murdered was established beyond a reasonable doubt by the finding of his body and the shotgun wounds thereon which caused his death and which could not have been self-inflicted. The jury was fully justified in concluding that the Essex automobile belonging to appellant was at the scene of the tragedy when it occurred. Who could have placed the identification card in deceased's pocket? Villa did not know him. The only persons knowing the relationship between Villa and appellant were their immediate families. Hence, with the Essex present the jury was justified in deciding that appellant had placed or arranged the placing of the card there, which is also corroborated by his partial identification of deceased as Villa. The circumstantial evidence produced convinced the jury beyond a reasonable doubt under the instructions of the court of the guilt of the appellant, and it is not the province of an appellate court to overturn such a conclusion, except it be determined that there was no evidence to sustain it. (*People* v. *Tom Woo*, 181 Cal. 315 [184 Pac. 389].)

 The appellant contends that the evidence was insufficient to support the verdict in that the autopsy surgeon's testimony as to the number of wounds on the body is incredible, contradictory of demonstrated fact, an invasion of the jury's province and without probative force, but in what respect this is so is not pointed out and the authorities cited are not helpful to appellant's contention, and the point may therefore be considered as without merit.

 He further argues that the trial court erred in receiving evidence with regard to an Essex sedan having been seen in the vicinity of the spot where the body was found. At the trial the appellant objected to this evidence on the ground that it was incompetent, irrelevant and immaterial, and that it did not tend to prove or disprove any issue in the case, and cited *People* v. *Smith,* 55 Cal. App. 324 [203 Pac. 816], where the defendant was charged with the murder of his wife through the use of cyanide, and the trial court admitted in evidence a can of cyanide to which the defendant had access at the place of his employment, and this court held that the presence of the can of cyanide in the filing room where defendant was employed was too remote from the point in issue to have any probative force, and therefore its admission in evidence was prejudicially erroneous. Here we have an entirely different situation. A man was shot and killed. His body was found in a desolate place, visited principally by hunters. A blue Essex sedan with a metal trunk on the rear was seen by a ranch hand on the day the gunshots were heard, parked near the place where the body was found, and two or three days before this the same kind of an automobile was seen by another person parked off to the side of the Mint canyon highway, which is the main highway leading to this section of the country, having on the windshield a gold star. The nature of the wounds on the body showed that the deceased was shot with a shotgun with the apparent purpose of destroying the features and for the purpose of passing the body off for that of another person by placing in the clothing on the body a forged identification card of a person on whose life appellant had about a month previously falsely obtained life insurance payable to himself. When appellant was first questioned as to the kind of an automobile he owned he mentioned a Star automobile parked in front of

his home and said nothing about owning a blue Essex sedan, although such a car was parked in his garage at the time. He also at first emphatically denied knowing anything about insurance on the life of Manuel Villa. Later he admitted owning a blue Essex sedan which was found in his garage and which had a gold star upon the windshield similar to that described as having been on the windshield of the Essex sedan which was seen parked off to the side of the Mint canyon highway by the witness Bevins, and which in other respects resembled appellant's Essex sedan. Later appellant also admitted taking out insurance on the life of Villa of which he was made the beneficiary. The circumstances, therefore, of a blue Essex sedan with a black top, a metal trunk on the rear, and a ragged gold star pasted on the windshield, having been seen by witnesses in the vicinity of the spot where the body of Flores was found at and about the time the deceased was killed was connected with appellant by the finding of an Essex sedan of the same description in the appellant's garage. (*People* v. *Peete*, 54 Cal. App. 333, 348, 349 [202 Pac. 51]; *People* v. *Billings*, 34 Cal. App. 549, 552, 553 [168 Pac. 396].) The motion to strike this evidence was therefore properly denied.

Appellant's next point is that the court erred, to the manifest prejudice of appellant, in authorizing a verdict on the theory of complicity. From the evidence presented it was possible for the jury to have drawn certain legal inferences such as that the appellant himself placed the identification card upon the body so as to identify it as that of Manuel Villa, and that appellant himself wrote the card in a simulated handwriting with his left hand, and that appellant himself secured a shotgun and fired the fatal shots. Again, the jury might have inferred that while appellant did not do the killing, someone else with appellant may have fired the shots and the appellant had thereafter placed the identification card upon the body. Again, the jury might have inferred that appellant had no shotgun and did not borrow one; that he himself did not write the identification card, that he did not place it upon the body; that appellant's Essex sedan was the one seen at the scene of the killing, and in the general vicinity of the place where the killing occurred, and that the same was loaned by appellant to someone for the purpose of killing a Mexican of the same

general height and weight of Manuel Villa and destroying the features and then placing this card upon the body for the purpose of securing the insurance on the life of Manuel Villa. This latter inference would be supported by the fact that appellant failed to disclose to the officers on the day the body was found that he had a blue Essex sedan in his garage after being informed that the officers doubted that the body was that of Manuel Villa, and that they were looking for a blue Essex sedan. It is evident that whoever killed Flores knew Villa and his address and knew appellant and his address. It is also obvious that appellant forged the name or knew of the forgery of the name of Manuel Villa upon the two applications for insurance in which appellant was named beneficiary, and that the killing of Flores and the attempt to have the body identified as that of Villa were the final acts in a scheme to collect life insurance upon the forged applications and the policies of insurance issued thereon.

 The right to draw proper inferences from the evidence is a function of the jury; and as long as its conclusions do not do violence to reason, an appellate court is not permitted to substitute its finding of the ultimate fact for that reached by the constitutional as well as the statutory arbiter thereof. Circumstantial evidence may be as convincing in its force and as conclusive as the testimony of witnesses to an overt act. (*People* v. *Kneiling, supra.*)

 It is contended by appellant, as already noted, that the court erred in authorizing a verdict on the theory of complicity. Possible theories that may be deduced from the evidence which would support the verdict of the jury have been heretofore suggested. It was, therefore, proper for the trial court to have instructed the jury that it was immaterial whether appellant directly committed the crime or aided and abetted, or, being present, advised and encouraged its commission. In *People* v. *Burke*, 18 Cal. App. 72, 103 [122 Pac. 435], it is said in speaking of inferences and of an offered instruction in connection therewith, which the trial court refused to give:

"In the first place, from the evidence introduced by the prosecution, it would be a fair inference either that the defendant personally exploded the dynamite or that it was done by someone else with his knowledge and cooperation.

Hence, appellant's proposed instruction was properly refused. But it cannot be the law under our practice that a defendant must necessarily be acquitted of the crime charged, for the reason that it may be uncertain as to who committed the act. Of course, it must be shown that the crime was actually committed. Of this there could be no doubt in the case at bar. And, since he can be charged in the indictment as a principal whether he actually committed the offense or aided and abetted or encouraged its commission, he can be justly convicted if the evidence shows that he was connected with the crime in either relation. The district attorney is not required to elect whether he will prosecute or ask for a conviction upon the ground that the defendant was the principal or an accessory before the fact, but he may ask for a verdict if the evidence satisfies the jury of either alternative. It appears to follow that the additional burden is not cast upon the people to identify someone else as having guilty connection with the crime." (See *People* v. *Peete, supra,* pp. 356, 357, 358, 359.) The contention that the court left no doubt in the minds of the jurors that they were entirely authorized to find a verdict against the defendant, even though his testimony as to alibi was true, and he was not at the scene of the murder at the time the homicide was committed, and that this was prejudicial error, is not supported by the cases cited which we have read and considered.

Appellant asserts: "That the court prejudiced the appellant in refusing to instruct the jury, at appellant's request, that they could not base a verdict on suspicion, surmise or conjecture, and that this principle of law does not appear in any of the instructions given by the court."

The court instructed the jury at the request of appellant as follows:

"In a case where circumstantial evidence is relied upon by the people for conviction, the circumstances must be consistent with the guilt of the defendant and inconsistent with any other rational hypothesis. If the circumstances in evidence point to the defendant as being guilty, and also point with equal force to some other person not connected with the defendant, or to some unidentified person or agency as the cause of the death of the deceased, and if it is equally probable under the evidence that either the defendant, the third

person, or such unidentified person or agency killed the deceased, then your verdict must be 'not guilty'."

Also: "When the people rely upon circumstantial evidence to convict the defendant, every link in the chain of circumstances necessary to a conviction must be established by the evidence to a moral certainty and beyond a reasonable doubt."

The trial court also defined to the jury, in the language of the statute, the term "reasonable doubt". The rule is too well established to require the citation of authority, that it is not error to refuse a requested instruction if it has been covered by those already given.

Appellant's final point is that the venue was not proved, and it is suggested that the murder might as well have been committed in Arizona and the body brought to where it was found. The coagulated blood on the ground underneath the head of deceased dispels the suggestion that the deceased was killed at some remote place, and the point is therefore without merit.

The judgment and order are affirmed.

Seawell, J., Shenk, J., Waste, C. J., and Curtis, J., concurred.

Rehearing denied.